Hilda Loretta SIMPSON and Darrell Eugene Carter as Co–Personal Representatives of the Estate of Mamie Elizabeth Strong, Dec'd, Appellants–Respondents,

v.

Carl F. STRONG, Respondent–Cross–Appellant.

Nos. 27235, 27251.

Missouri Court of Appeals, Southern District, Division Two.

Aug. 14, 2007.

Motion for Rehearing or Transfer to Supreme Court Denied Sept. 4, 2007.

Application for Transfer Denied Oct. 30, 2007.

568 

Randy John Reichard, Springfield, MO, for Appellants/Respondents.

James M. Kelly, Republic, MO, for Respondent/Cross–Appellant.

JEFFREY W. BATES, Chief Judge.

These appeals arise out of a dissolution action filed by Mamie Strong (Wife) against Carl Strong (Husband). After the court entered a judgment of legal separation, Wife died. Wife's children, Hilda Loretta Simpson (Simpson) and Darrell Eugene Carter (Carter), were substituted as parties-plaintiff in their capacities as the co-personal representatives of the decedent's estate for Wife. We will collectively refer to Simpson and Carter as "Representatives." Husband initially appealed from the judgment, and a cross-appeal was filed by Representatives. Pursuant to Rule 84.04(j), they were treated as the appellants because Wife was the plaintiff below.[1] On appeal, Representatives claim the trial court erred by: (1) granting Husband leave to amend his answer only two weeks before trial to deny that the marriage was irretrievably broken; and (2) finding that the parties' marriage was not irretrievably broken. Husband contends the trial court erred by: (1) granting a legal separation, which was not requested by either party; (2) failing to dismiss Wife's petition after finding the marriage was not irretrievably broken; and (3) denying Husband's motion to stay the proceedings pending determination of Wife's mental capacity in a guardianship or conservatorship proceeding. Finding no error as posited by either Representatives or Husband, we affirm.

## I. Standard of Review

In this court-tried case, our review is governed by Rule 84.13(d). *Hall v. Hall,* 53 S.W.3d 214, 217 (Mo.App.2001). The judgment will be affirmed unless there is no substantial evidence to support the judgment, the judgment is against the weight of the evidence or the judgment erroneously declares or applies the law. *Murphy v.*

---

1. All references to rules are to Missouri Court Rules (2007).

*Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976); *In re Marriage of Reese,* 155 S.W.3d 862, 869 (Mo.App.2005). On appeal, "[w]e defer to the trial court's determination of witness credibility and recognize that the court is free to accept or reject all, part, or none of the testimony presented." *Christian Health Care of Springfield West Park, Inc. v. Little,* 145 S.W.3d 44, 48 (Mo.App.2004). We view the evidence and all permissible inferences from that evidence in the light most favorable to the judgment and ignore all contrary evidence. *Mehra v. Mehra,* 819 S.W.2d 351, 353 (Mo. banc 1991); *In re Marriage of Denton,* 169 S.W.3d 604, 606 (Mo.App.2005).

## II. Factual and Procedural Background

Husband and Wife were married on December 28, 1954 in Pottawattamie County, Iowa. Simpson and Carter were Wife's two children from a prior marriage. No children were born of the marriage between Husband and Wife. In December 2003, they were living in Republic, Missouri. After Wife fell and broke her shoulder, Husband placed Wife in the Christian Health Care Center (CHCC) in Republic, Missouri, while she recovered. Husband continued to live in the marital home. In early March 2004, Husband and Wife separated after nearly fifty years of marriage. Wife moved from CHCC into Simpson's home in Gainesville, Missouri.

On March 10, 2004, Wife filed a petition for dissolution of marriage in the Circuit Court of Greene County, Missouri. In Wife's petition, she alleged there was no reasonable likelihood that the marriage between the parties could be preserved, and therefore, their marriage was irretrievably broken. In May 2004, Husband filed his answer to the petition. His answer admitted the marriage was irretrievably broken, and Husband asked the court to dissolve the marriage. In September 2004, Husband was granted leave to file a cross-petition for dissolution of marriage. The cross-petition also alleged that the marriage was irretrievably broken and asked the court to dissolve the marriage. That same month, the case was set to commence trial on March 30, 2005.

In October 2004, Husband filed a motion to compel Wife to submit to a mental examination to determine her competency. The court sustained the motion. Thereafter, Wife submitted to two examinations.

On December 21, 2004, Wife was sent by her attorney to be examined by Steven T. Akeson, Psy.D. (Akeson). During Wife's interview with Akeson, she reported a long, unhappy marriage and clearly wanted a divorce. When Akeson asked why, Wife said "I can't stand [Husband]." Based upon the results of various psychological tests, Akeson opined that Wife had significant problems with her memory, but she had marginal judgment skills. While she was not able to live independently, "[t]his does not necessarily exclude her from exercising specific competencies that only require certain skills. In this situation [Wife] maintains marginal judgment skills and if that was the only impairment she would be competent to proceed in civil cases with appropriate legal counsel." Akeson did caution, however, that Wife's memory impairment made her susceptible to believing things that were not true and could prevent her from accurately recalling the entire history of her marriage. Akeson also expressed one additional concern:

[T]his divorce appears to come on the heels of her being placed in a nursing facility by her husband and then being removed from the facility by her daughter. This series of events may be viewed by [Wife] as [Husband] abandoning her and [Simpson] rescuing her. If

this is how she sees it then this may distort how she remembers her marriage.

On February 18, 2005, Wife was sent by Husband's attorney to be examined by Michael Whetstone, Ph.D., A.B.P.P. (Whetstone). Whetstone also interviewed Wife and gave her various psychological tests. According to Whetstone, Wife believed that her marriage had long been unsatisfactory and that she wanted a divorce. Whetstone noted that, "I believe her decision to seek divorce is her own and should be respected as such." However, Wife demonstrated notable and significant deficits in memory, learning, recall and judgment that were consistent with moderate dementia. Whetstone opined that Wife would benefit from having a guardian and a conservator.

On March 7, 2005, Husband moved to stay the proceedings pending the appointment of a guardian or conservator for Wife. Two days later, the court conducted a hearing on that issue and denied the request for a stay.

On March 11, 2005, Husband dismissed his cross-petition for dissolution without prejudice and requested leave to file an amended answer. The legal file contains no written response to the motion by Wife. On March 17, 2005, the court held a hearing on Husband's motion, but no record of that hearing exists. The court noted in a docket entry that the motion to amend was "sustained over objection of" Wife. The legal file contains no information concerning the nature of Wife's objection. Husband's verified amended answer denied that the marriage was irretrievably broken and asked the court to dismiss Wife's petition.

On March 29, 2005, Husband filed a motion for continuance, and Wife filed a motion to appoint Carter as her next friend because of her physical infirmities. The court held a hearing on the motions that same day. The request for a continuance was denied. The motion to appoint Carter as Wife's next friend was sustained.

Trial commenced on March 30, 2005. Before evidence was adduced, the trial court granted Husband leave to further amend his prayer for relief to request that the court "continue this matter for further hearing not less than 30 days nor more than 6 months, and thereafter enter that alternative relief authorized by Section 452.320.2(2)." [2]

At trial, the written evaluations by Akeson and Whetstone were admitted into evidence as Joint Exhibit 1. The court also heard testimony from Wife, Heather Allen, Ginger Ulesich and Husband. Viewed in a light most favorable to the judgment, their testimony is summarized below.

### Wife

Wife believed she was 84 years old, but she did not remember what year she was born or what year the trial was occurring. She could not recall what year she married Husband. In Wife's initial petition and in her deposition taken one week before trial, Wife mistakenly stated that she and Husband were married in Kansas because Wife sometimes got that state confused with Iowa. She wanted a divorce from Husband because he was "not good" to her. As an example of such conduct, Wife said Husband wouldn't go out and get her a cheeseburger when she wanted one. Wife could not recall when that occurred. Wife said her sister, Beulah, brought her food. Wife could not recall where Beulah lived, but said "I don't think it matters." In point of fact, Beulah had been deceased for about 30 years. Wife also said she was

2. All references to statutes are to RSMo (2000) unless otherwise specified.

subjected to "cruel treatment" because Husband never did anything Wife asked. As an example, Wife said Husband would not take her to the grocery store when she wanted to go. Wife thought she lived in Republic, Missouri. Actually, at the time of trial, Wife resided with Simpson in Gainesville. Wife said that, before she moved into her daughter's home, she had lived in Kansas City, Missouri. She thought she had lived in Republic with Husband "about a week or so." She recalled telling people that she was mad at Husband because he had put her in a nursing home, which she described as "kind of a low blow." When asked to provide any other reason why she wanted a divorce, the following exchange took place:

Q. Other than what you've told us here today, is there any other reason why you don't want to be married to [Husband]?

A. I don't think he wants me.

Q. You don't think he wants you?

A. No.

Q. If he were to tell you he wants you and he wants you to move back with him, would that make any difference to you?

A. It would make a lot of difference, but I'm not going.

. . . .

Q. Is there some reason you wouldn't go if he asked you to come back?

A. Well, in the first place, I don't think he wants me back.

Q. Has somebody told you that?

A. No.

### Heather Allen

In December 2003, Heather Allen (Allen) was employed as a social worker and admissions coordinator at CHCC in Republic. Wife was admitted on December 9, 2003, after she had fallen and fractured her shoulder at home. Wife's home healthcare nurse recommended that Wife be placed at CHCC. Wife was not happy about being placed in a nursing home and wanted to remain at home. During the first part of Wife's stay at CHCC, Husband spent some nights with her. He came to the nursing home every day and stayed all day long. He only went home long enough to shower and change clothes. Allen personally observed no problems between Husband and Wife.

About the time Wife was due to be discharged from CHCC in March 2004, Husband began asking Allen what he needed to do to prepare for Wife coming home. Allen discussed the training that Husband would need to have before he could care for Wife. Around that same time, Wife had a conversation with Allen about divorcing Husband. Wife said she wanted a divorce because she did not believe Husband would stay with her 24 hours a day like she needed. According to Wife, Husband had previously left her at home for a few hours without anything to eat, and she was unable to go get anything on her own.

### Ginger Ulesich

Ginger Ulesich (Ulesich) worked as an occupational therapy assistant at CHCC in Republic while Wife was a patient there. Wife complained that Husband had placed her there. Patients at CHCC frequently blamed their prior, primary caregiver with placing them in a nursing home when it was actually ordered by a physician. Husband frequently came to visit Wife. Husband would stay in Wife's room or sit outside in a small alcove. Husband and Wife sometimes argued, but Ulesich could not specify how often that occurred. She also could not hear what they were saying, so she did not know what had caused the

arguments. Wife asked to be taken home one afternoon for a short visit, and Husband complied with that request. Staff were required to document how much Wife ate, but she did not like the food at the nursing home. On one occasion, Wife asked Husband to go buy her a hamburger. He declined to do so.

### Husband

Husband and Wife were married on December 28, 1954 in Pottawattamie County, Iowa. Wife had a sister named Beulah who died around 1975. Prior to 1999, Husband and Wife lived together in Kansas City, Missouri. In 1999, the couple purchased a home in Republic. Husband did most of the grocery shopping and purchased food for himself and Wife. There was always plenty of food at the house, and Wife never complained about not getting enough to eat. Husband bought Wife anything she wanted, such as clothes and a new car. They got along pretty well and didn't have too many arguments.

Husband and Wife lived together in their marital home until December 9, 2003 when Wife was admitted to CHCC to recuperate from her broken shoulder. A home healthcare nurse recommended that Wife be admitted to CHCC and made all of the arrangements. After Wife was admitted, Husband was at CHCC every day. He usually arrived before 7:30 a.m. and stayed until around 5:00 p.m. During the first two weeks, he stayed overnight as well. Wife wanted Husband to take her home all the time, but Husband was only allowed to take her for a visit on one occasion. Wife was allowed 100 days of nursing-home admission pursuant to her insurance plan. Husband intended to take her home at the end of that period. About one week before Wife's insurance benefits terminated, her children took her out of CHCC.

Husband and Wife separated on March 4, 2004, when Wife was discharged from CHCC. She went to live with Simpson in Gainesville. Husband was totally surprised when he was served with the summons and divorce petition because he hadn't known a thing about it. He believed her children had "made this all up" and obtained a lawyer for Wife. He "went into shock" and had to be hospitalized.

During the marriage, Husband and Wife kept their earnings in separate accounts. It was Wife's idea to do so. Wife had access to $100,000 to provide for her own care while she was living with Simpson, but Husband would have helped Wife financially if she needed any assistance. Husband would have added Wife's name to any of his separate accounts if she had asked him to do so. After Wife went to live with Simpson, Husband added his niece's name to one of his accounts as a pay-on-death (POD) beneficiary.

Husband testified that there was a reasonable likelihood that his marriage to Wife could be preserved. Husband believed that they could work out their differences and get back together. He wanted Wife to move back into the marital home and was willing to hire help so she could do so. Wife's children had started the trouble between Husband and Wife by encouraging her to get a divorce while she was in the nursing home. Husband believed that Wife's mind "wasn't right" while she was there. Before Wife entered the nursing home, she never said that she wanted a divorce, wanted to move out or was dissatisfied with anything. Husband only filed his own cross-petition seeking a divorce because his attorney advised him to do so. The attorney was concerned that Wife would dismiss her Greene County case and refile it in Ozark County.

When Wife moved to Gainesville, Husband was no longer able to drive a car.

He spoke to Wife once by telephone. Husband tried to call her on another occasion, but Simpson answered the telephone and refused to let Husband talk to Wife. Husband had to get a restraining order against Simpson because she threatened to ram her car into his house. Husband did not correspond with Wife, but he only had a third-grade education and could not read very well. He needed assistance in understanding what he tried to read.

On May 12, 2005, a final judgment was entered in the case. The court denied Wife's request for a divorce for the following reasons:

> The Court, further, after weighing all relevant factors, including the circumstances that gave rise to the filing of the Petition and the prospect of reconciliation, finds that there remains a reasonable likelihood the marriage can be preserved and therefore, the marriage is not irretrievably broken. The Court finds that [Wife] has not presented substantial evidence to support any of the factors required by Section 452.320.2(1), and therefore, the Court enters Findings and Recommendations for a Judgment of Legal Separation.

Based upon the provisions of § 452.305, the court decided that it was obligated to grant a judgment and decree of legal separation. Although that disposition conflicted with § 452.320, the court reasoned that "it is compelled to follow the requirements in Section 452.305.2 as the more specific and recent statute controlling in this matter." The court determined that the parties possessed marital property valued at $689,725. Husband was awarded property worth $586,726, and Wife was awarded property worth $102,999. To equalize the division of property, Husband was ordered to pay Wife the sum of $241,863.50. That distribution resulted in Husband and Wife each receiving 50% of the marital assets.

Wife died on June 10, 2005. Suggestions of death were filed by Husband on June 13, 2005. On August 26, 2005, Husband filed a motion requesting that Simpson and Carter, in their capacities as the co-personal representatives of Wife's estate, be substituted as parties-plaintiff. On September 6, 2005, the court granted the motion and entered an order of substitution. These cross-appeals followed.

### III. Discussion and Decision

■ Before addressing the merits in this case, there is a jurisdictional issue that we must address sua sponte. *Carpenter v. Carpenter*, 159 S.W.3d 880, 882 (Mo.App. 2005). On May 12, 2005, the family court commissioner filed his findings and recommended that a judgment and decree of legal separation be entered. That same day, those findings and recommendations were adopted by an article V judge and incorporated into the court's judgment. Wife died on June 10, 2005. Suggestions of death were filed on June 13, 2005. Within the 90–day time period provided by Rule 52.13(a), Husband filed a motion requesting that Simpson and Carter be substituted for Wife as parties-plaintiff. After that motion was granted, all parties appealed from the judgment and decree of legal separation. The issue we must decide is whether Wife's death deprives this Court of appellate jurisdiction due to the abatement doctrine.

■ Generally, jurisdiction abates in a marriage dissolution action when one of the parties dies while the case is pending. *Linzenni v. Hoffman*, 937 S.W.2d 723, 726 (Mo. banc 1997). One caveat to this general rule, however, is that "the doctrine of abatement is inapplicable where a dissolution of marriage has been ordered prior to the death of a party, even though the order may be partial, interlocutory or not a final judgment resolving all issues in the

case." *Id.; Fischer v. Seibel,* 733 S.W.2d 469, 472 (Mo.App.1987). In the case at bar, the court entered a judgment of legal separation and divided the parties' marital assets prior to Wife's death. Therefore, the instant action did not abate. *See Linzenni,* 937 S.W.2d at 726; *Clark v. Clevenger,* 978 S.W.2d 511, 513 (Mo.App.1998); *Cregan v. Clark,* 658 S.W.2d 924, 927 (Mo.App.1983).

### Representatives' Appeal

■ In Representatives' first point, they contend the trial court erred in granting Husband leave to amend his answer two weeks before trial to deny that the marriage was irretrievably broken. On appeal, Representatives argue that the ruling was prejudicial to Wife because: (1) by the time the amendment was requested, her ability to present evidence on the issue of Husband's behavior was hindered by the deterioration of her mental condition; and (2) the amendment was not based on any new matter that was not known to him earlier. Based on the record before us, however, we are unable to ascertain whether either of these objections was made below. The docket sheet reveals that the court held a hearing on Husband's motion for leave to amend his answer. Wife could have had a record made of this pre-trial hearing. *Tessmer v. Tessmer,* 611 S.W.2d 299, 300 (Mo.App.1980). She failed to do so, and all the docket entry discloses is that the motion was "sustained over objection of" Wife.

■ On appeal, a party is held to the specific objections presented to the trial court. *State ex rel. Selby v. Day,* 929 S.W.2d 286, 288 (Mo.App.1996). Objections not presented to or expressly decided by the trial court are not preserved for review. *Federal Deposit Ins. Corp. v. Crismon,* 513 S.W.2d 305, 307 (Mo.1974).

Because an appellate court is not a forum in which new points will be considered, but is merely a court of review to determine whether the rulings of the trial court, as there presented, were correct, a party seeking the correction of error must stand or fall on the record made in the trial court, thus it follows that only those objections or grounds of objection which were urged in the trial court, without change and without addition, will be considered on appeal. *Robinson v. Empiregas Inc. of Hartville,* 906 S.W.2d 829, 836 (Mo.App.1995). Because the record contains nothing that permits us to determine whether the objections advanced on appeal were presented to and decided by the trial court, we are unable to adequately review this claim of error. *In re Marriage of Chamberlain,* 63 S.W.3d 326, 331 (Mo.App.2002); *Refrigeration Supplies, Inc. v. J.L. Mason of Missouri, Inc.,* 872 S.W.2d 105, 108 (Mo.App. 1994).

*Ex gratia,* we note that leave to amend a pleading pursuant to Rule 55.33(a) "shall be freely given when justice so requires" and is a matter within the sound discretion of the trial court. *See Hoover v. Brundage–Bone Concrete Pumping, Inc.,* 193 S.W.3d 867, 870–71 (Mo.App.2006). Representatives admit that they were unable to find any case in which a Missouri appellate court has reversed a trial court's decision to permit a party to amend its pleadings shortly before trial. Conversely, a trial court's decision to permit a defendant to amend its answer three days before trial to assert on overlooked defense has been upheld on appeal. *See DeArmon v. City of St. Louis,* 525 S.W.2d 795, 802–03 (Mo.App.1975). Representatives' first point is denied.

■ In Representatives' second point, they contend the trial court erred in finding that there remained a reasonable like-

lihood that the marriage could be preserved and therefore, the parties' marriage was not irretrievably broken. "A trial court is authorized to dissolve a marriage upon a finding that it is irretrievably broken." *Wagoner v. Wagoner,* 76 S.W.3d 288, 290 (Mo.App.2002); § 452.305.1(2). In this case, Husband denied under oath in his amended answer that the marriage was irretrievably broken. Therefore, no finding that the marriage was irretrievably broken could be made unless the court heard the evidence and was convinced by Wife that one or more of the following was true:

(a) That the respondent has committed adultery and the petitioner finds it intolerable to live with the respondent;

(b) That the respondent has behaved in such a way that the petitioner cannot reasonably be expected to live with the respondent;

(c) That the respondent has abandoned the petitioner for a continuous period of at least six months preceding the presentation of the petition;

(d) That the parties to the marriage have lived separate and apart by mutual consent for a continuous period of twelve months immediately preceding the filing of the petition;

(e) That the parties to the marriage have lived separate and apart for a continuous period of at least twenty-four months preceding the filing of the petition....

§ 452.320.2(1). Representatives argue that the court's failure to grant a dissolution was not supported by substantial evidence and was against the weight of the evidence because the evidence demonstrated that Husband behaved in such a way that Wife could not reasonably be expected to live with him. We disagree.

Viewed in a light most favorable to the judgment, the court was presented with substantial evidence that the marriage between Husband and Wife was not irretrievably broken. Husband testified that, prior to December 2003, he and Wife got along pretty well and rarely argued. Husband adequately provided for Wife's needs and purchased items that she wanted, such as clothing and a new car. During their 50 years of marriage, Wife had never said that she wanted a divorce, wanted to move out or was dissatisfied with anything. When Wife was admitted to CHCC, Husband spent hours every day at that facility so he could be with his wife. He planned to take her home when she was discharged, and Husband was willing to hire help so Wife could come home. He spoke to the CHCC staff about obtaining training that he would need to care for Wife. Husband was so shocked when Wife filed for divorce that he had to be hospitalized. Husband testified that there was a reasonable likelihood that the marriage could be preserved because he believed the couple could work things out. According to Husband, Wife's children were the ones who convinced her to seek a divorce, and that decision resulted from Wife's deteriorating mental condition after she entered CHCC. Husband's testimony was corroborated by the mental examinations of Wife, which showed that: (1) she suffered from moderate dementia and only had marginal judgment skills; (2) her memory impairment made her susceptible to believing things that were not true; (3) that same impairment could prevent her from accurately recalling the entire history of her marriage; and (4) her view of the marriage also could be distorted by the misperception that it was Husband who placed her at CHCC and Simpson who rescued her from that facility.

Representatives argue, however, that the court should have found that the marriage was irretrievably broken based upon

the following evidence: (1) Husband only spoke to Wife once in the year before trial; (2) the couple frequently argued; (3) Husband did not provide for Wife's needs and desires; (4) Husband added his niece's name to a bank account after the separation; and (5) Husband had alleged in his cross-petition that the marriage was irretrievably broken. The difficulty with this argument is that there was conflicting evidence before the court on all of these matters, and the trial court was not persuaded by the isolated bits of evidence upon which Representatives rely.

While Husband had limited contact with Wife before trial, the court was presented with ample evidence explaining why that was so. When Wife left CHCC, she moved to Gainesville. Husband was no longer able to drive. He could not read or write well. He did speak to Wife once by telephone. When he tried to call her again, however, that attempt was thwarted by Simpson. Threats she made against Husband resulted in a restraining order being issued against her.

Representatives next contend that Husband and Wife frequently argued. That contention ignores Husband's contrary testimony. There was evidence about arguments at the nursing home from Ulesich, but her testimony on that subject was vague and nonspecific. She did not know who started the arguments, what subjects the arguments concerned or how often they occurred. Furthermore, Husband testified that Wife's mind was not right after she entered CHCC, and that testimony was corroborated by the results of two mental examinations of Wife.

The same can be said about the contention that Husband failed to provide for Wife's needs. He testified that he adequately provided for her needs. Wife gave contrary testimony, but it is abundantly clear from the transcript that her ability to recall events was substantially hampered by her moderate dementia. Wife's inability to provide any significant details about Husband's conduct could have raised significant doubt about the credibility of her testimony on that subject. Husband denied that he mistreated Wife and specifically testified about how he provided for Wife's needs.

Husband did designate his niece as a POD beneficiary on a bank account after the separation. That action did not result in the diversion of any marital assets to the niece, and this argument ignores the testimony that it was Wife's idea for the couple to keep their finances separate. Each spouse had accounts on which the other spouse was not named. That pattern of behavior had persisted since the outset of the couple's marriage.

Finally, Husband did allege in his cross-petition that the marriage was irretrievably broken. He explained, however, that he only did so based on his attorney's advice. In any event, he dismissed that cross-petition prior to trial, and he filed a verified amended answer denying that the marriage was irretrievably broken. He provided testimony to that effect at trial.

■ In sum, it was Wife's burden to prove that Husband behaved in such a way that she could not reasonably be expected to live with him. § 452.320.2(1)(b); *Burns v. Burns*, 872 S.W.2d 628, 630 (Mo.App. 1994). The facts cited by Representatives were controverted by other evidence and presented credibility determinations for the court to make. "Great deference is given a trial court's ability to determine witness credibility." *Harper v. Harper*, 4 S.W.3d 626, 628 (Mo.App.1999). The court is free to accept or reject all, part, or none of the testimony presented. *Christian Health Care of Springfield West Park, Inc. v. Little*, 145 S.W.3d 44, 48 (Mo.App.2004).

The court found that the marriage between Husband and Wife was not irretrievably broken. Based upon our review of the record, that finding is supported by substantial evidence. "Although there may be a difference of opinion as to whether Husband's conduct was egregious enough that Wife could not be expected to live with it, we must defer to the trial court's assessment of the factual evidence in this regard." *Wagoner v. Wagoner*, 76 S.W.3d 288, 291 (Mo.App.2002).

Representatives' argument that the judgment is against the weight of the evidence fares no better. The phrase "weight of the evidence" means its weight in probative value, rather than the quantity or amount of evidence. *Nix v. Nix*, 862 S.W.2d 948, 951 (Mo.App.1993). The weight of the evidence is not determined by mathematics, but depends on its effect in inducing belief. Id. An appellate court exercises extreme caution in considering whether a judgment should be set aside on the ground that it is against the weight of the evidence and will do so only upon a firm belief that the judgment was wrong. *In re Marriage of Murphey*, 207 S.W.3d 679, 683 (Mo.App.2006). The trial court found that the marriage between Husband and Wife was not irretrievably broken. After reviewing the record, we do not have a firm belief that the court's finding was wrong. Representatives' second point is denied.

### *Husband's Appeal*

Husband's first and second points challenge the form of relief granted below. The trial court decided that, after finding the marriage was not irretrievably broken, it was required to grant a legal separation based on the provisions of § 452.305.2(1). In Point I, Husband claims this was erroneous because: (1) Wife's petition did not request that relief; (2) neither party re-

quested that such relief be granted; and (3) Wife presented no evidence to support such relief. In Point II, Husband claims the court was required to dismiss the case pursuant to § 452.320. Because of the interrelated nature of these points, we consider them together. For the reasons that follow, we find Husband's arguments unpersuasive.

The disposition of these points requires us to resolve a conflict between the provisions of § 452.305 and § 452.320 due to the amendment of the latter statute in 1998. To understand the import of this amendment, a brief review of both statutes and their amendatory history is required. For ease of analysis we will examine these statutes in reverse order.

In 1973, § 452.320 was enacted as section 5 of House Bill 315. 1973 Mo. Laws 470. In pertinent part, § 452.320 RSMo Cum.Supp. (1975) originally stated:

1. If both of the parties by petition or otherwise have stated under oath or affirmation that the marriage is irretrievably broken, or one of the parties has so stated and the other has not denied it, the court, after considering the aforesaid petition or statement, and after a hearing thereon shall make a finding whether or not the marriage is irretrievably broken, and where one of the parties has not denied it the court shall cause to be deposited in the United States mail an envelope, certified or registered, deliver to addressee only, return receipt requested, and with postage prepaid enclosing a notice to the party not denying that absent objection from said party being filed within ten days after date of mailing that a finding the marriage is irretrievably broken and an order of dissolution of marriage may be entered of record. The failure of such party to receive such notice

shall not impair the power of the court to enter an order dissolving the marriage or the validity of such an order; but

2. If one of the parties has denied under oath or affirmation that the marriage is irretrievably broken, the court shall consider all relevant factors, including the circumstances that gave rise to the filing of the petition and the prospect of reconciliation, and after hearing the evidence shall

(1) Make a finding whether or not the marriage is irretrievably broken, and in order for the court to find that the marriage is irretrievably broken, the petitioner shall satisfy the court of one or more of the following facts:

(a) That the respondent has committed adultery and the petitioner finds it intolerable to live with the respondent;

(b) That the respondent has behaved in such a way that the petitioner cannot reasonably be expected to live with the respondent;

(c) That the respondent has abandoned the petitioner for a continuous period of at least six months preceding the presentation of the petition;

(d) That the parties to the marriage have lived separate and apart by mutual consent for a continuous period of twelve months immediately preceding the filing of the petition;

(e) That the parties to the marriage have lived separate and apart for a continuous period of at least twenty-four months preceding the filing of the petition; or

(2) Continue the matter for further hearing not less than thirty days or more than six months later, or as soon thereafter as the matter may be reached on the court's calendar, and

may suggest to the parties that they seek counseling. No court shall require counseling as a condition precedent to a decree, nor shall any employee of any court, or of the state or any political subdivision of the state, be utilized as a marriage counselor. At the adjourned hearing, the court shall make a finding whether the marriage is irretrievably broken as set forth in subdivision (1) above and shall enter an order of dissolution or dismissal accordingly.

In 1973, § 452.305 was enacted as section 2 of House Bill 315. 1973 Mo. Laws 470. In pertinent part, § 452.305 RSMo Cum.Supp. (1975) originally stated:

1. The circuit court shall enter a decree of dissolution of marriage if ...

(2) The court finds that there remains no reasonable likelihood that the marriage can be preserved and therefore the marriage is irretrievably broken....

2. If a party requests a decree of legal separation rather than a decree of dissolution of marriage, the court shall grant the decree in that form.

In *McRoberts v. McRoberts*, 555 S.W.2d 682 (Mo.App.1977), the court noted an internal conflict between the provisions of § 452.305.1 and § 452.305.2. The former subsection required the court to enter a decree of dissolution if the court found that the marriage was irretrievably broken. Id. at 683. The latter subsection, however, mandated that the decree be in the form of a legal separation if requested by a party. Id. The court resolved the conflict by holding that "the mandatorily required decree of dissolution upon the court's finding that the marriage is irretrievably broken must be deemed to be modified by the second provision requiring that a decree of legal separation be decreed if a party so re-

quests." Id. at 684. Thus, before a court could grant *either* a decree of dissolution or a decree of legal separation, the court had to find that the marriage was irretrievably broken.[3] This construction of § 452.305 was in harmony with the requirement in § 452.320.2(2) RSMo Cum. Supp. (1975) that the court was required to dismiss the action unless the court found that the marriage was irretrievably broken.

As *McRoberts* illustrates, § 452.305.2 RSMo Cum.Supp. (1975) provided for a mandatory legal separation at one party's request. *Howard v. Howard,* 583 S.W.2d 553, 555 (Mo.App.1979). *Smith v. Smith,* 561 S.W.2d 714 (Mo.App.1978), addressed the issue of how a request for a legal separation had to be made. There, the wife's petition alleged that the marriage was irretrievably broken. The husband's answer denied that allegation under oath as authorized by § 452.320.2 RSMo Cum. Supp. (1975). The trial court granted a decree of dissolution. Wife argued that the form of the decree was proper because the request for a legal separation had to be made by petition. The appellate court disagreed and reversed the judgment, holding that "[n]othing in the language of the statute or its history supports this contention." *Id.* at 716–17. Thus, the filing of a verified answer denying that the marriage was irretrievably broken constituted a request for legal separation within the meaning of § 452.305.2. *Id.*

In 1977, § 452.320 was amended. The first subsection was modified to state:

1. If both of the parties by petition or otherwise have stated under oath or

affirmation that the marriage is irretrievably broken, or one of the parties has so stated and the other has not denied it, the court, after considering the aforesaid petition or statement, and after a hearing thereon shall make a finding whether or not the marriage is irretrievably broken and shall enter an order of dissolution or dismissal accordingly.

§ 452.320.1 RSMo (1978). As already noted, the reference in the last sentence in this subsection to entering an order of dissolution or dismissal must be interpreted in light of the decisional law requiring a finding that the marriage was irretrievably broken in order to grant either a decree of dissolution or legal separation. *See, e.g., Costello v. Costello,* 643 S.W.2d 81, 82 (Mo. App.1982); *J.A.A. v. A.D.A.,* 581 S.W.2d 889, 893 (Mo.App.1979); *McRoberts,* 555 S.W.2d at 683. In the absence of such a finding, dismissal was required because the court could not grant any relief to the parties.

The effect of the 1977 amendment to § 452.320 on the construction of that statute and § 452.305 was addressed in *Colabianchi v. Colabianchi,* 646 S.W.2d 61 (Mo. banc 1983). There, the husband filed a dissolution petition alleging that the marriage was irretrievably broken. In a cross-petition seeking legal separation, the wife also alleged that the marriage was irretrievably broken. *Id.* at 62. After the trial court granted a dissolution, the wife appealed. She contended that the trial court was obligated to grant a decree of legal separation because she had requested

---

3. In *J.A.A. v. A.D.A.,* 581 S.W.2d 889 (Mo.App. 1979), the court cited *McRoberts* for the principle that, "[a]lthough not expressly required by the language of [§ 452.305 RSMo Cum. Supp. (1975)], it logically follows that a decree of legal separation may only be entered following a finding by the trial court that the

marriage is irretrievably broken." *Id.* at 893. See *Costello v. Costello,* 643 S.W.2d 81, 82 (Mo.App.1982) (holding that "a decree of legal separation may only be entered after a finding that the marriage is irretrievably broken").

that form of relief. After noting the amendment to § 452.320.1 and the fact that both husband and wife had alleged in their petitions that their marriage was irretrievably broken, our Supreme Court held that the trial court properly granted a decree of dissolution:

> [The wife's] contention must fail because to the extent that § 452.305.2 is contrary to the later enacted provisions of § 452.320.1 the latter prevails. Where there are two acts on one subject, both should be given effect if possible, but if they are repugnant in any of their provisions, the later act, even sans a specific repealing clause, operates to the extent of the repugnancy to repeal the first, and this is true though the law does not favor repeal by implication. Hence § 452.320.1, not § 452.305.2, was controlling of the trial court's action and the cited cases construing that subsection are not dispositive of the issue before us.

*Id.* at 63 (citations omitted). Thus, *Colabianchi* teaches that, to the extent of a conflict between the provisions of § 452.305 and § 452.320, the controlling statute is the one that was most recently amended.

In 1998, the General Assembly made a very significant change to § 452.305. As amended, the statute stated:

1. The court shall enter a judgment of dissolution of marriage if:

(1) The court finds that one of the parties has been a resident of this state, or is a member of the armed services who has been stationed in this state, for ninety days immediately preceding the commencement of the proceeding and that thirty days have elapsed since the filing of the petition; and

(2) The court finds that there remains no reasonable likelihood that the marriage can be preserved and that therefore the marriage is irretrievably broken; and

(3) To the extent it has jurisdiction, the court has considered and made provision for child custody, the support of each child, the maintenance of either spouse and the disposition of property.

2. The court shall enter a judgment of legal separation if:

(1) The court finds that one of the parties has been a resident of this state, or is a member of the armed services who has been stationed in this state, for ninety days immediately preceding the commencement of the proceeding and that thirty days have elapsed since the filing of the petition; and

(2) The court finds that there remains a reasonable likelihood that the marriage can be preserved and that therefore the marriage is not irretrievably broken; and

(3) To the extent it has jurisdiction, the court has considered and made provision for the custody and the support of each child, the maintenance of either spouse and the disposition of property.

3. Any judgment of dissolution of marriage or legal separation shall include the Social Security numbers of the parties.

§ 452.305 RSMo Cum.Supp. (1998).[4] After this amendment to the statute, the

---

4. The General Assembly also amended § 452.310 to provide that "[t]he petition in a proceeding for legal separation shall allege that the marriage is not irretrievably broken and that therefore there remains a reasonable likelihood that the marriage can be preserved." § 452.310.1 RSMo Cum.Supp. (1998). Prior to the 1998 amendments to § 452.305 and § 452.310, an allegation to that effect in a petition would not have au-

form of relief granted by the trial court in a dissolution action was determined by what finding the court made on the status of the parties' marriage. *See Harper v. Harper,* 4 S.W.3d 626, 629 (Mo.App.1999). If the marriage was found to be irretrievably broken, a judgment of dissolution had to be entered. § 452.305.1 RSMo Cum. Supp. (1998). If the marriage was not found to be irretrievably broken, a judgment of legal separation had to be entered. § 452.305.2 RSMo Cum.Supp. (1998). As a consequence, this amendment nullified the holdings in prior cases such as *Costello* that a decree of legal separation had to be based upon a finding that the marriage was irretrievably broken. This amendment also nullified the provisions in § 452.320 requiring the dismissal of an action if the court did not find the marriage to be irretrievably broken.

■ With this lengthy prologue completed, we conclude that none of Husband's specific arguments in Points I or II have merit. Wife's petition alleged that the marriage was irretrievably broken, which was consistent with her request that a decree of dissolution be granted. Husband filed a verified answer denying that his marriage was irretrievably broken, which was authorized by § 452.320.2 and constituted his request that a decree of legal separation be granted. *See Smith v. Smith,* 561 S.W.2d 714, 716–17 (Mo.App. 1978). Once Husband did so, the trial court was required to make a finding on this disputed issue. In conformity with the positions the parties took in their pleadings and at trial, it was Husband who adduced evidence that the marriage was not irretrievably broken. The finding on that issue determined the form of the decree to be entered. § 452.305; *Harper v. Harper,* 4 S.W.3d 626, 629 (Mo.App.1999). Because the court found, as Husband requested, that the marriage was not irretrievably broken, the plain language of § 452.305.2 mandated that a decree of legal separation be entered.

In sum, it was not necessary for Wife's petition to request a legal separation in order for that relief to be granted. Since she was seeking a dissolution, she was not obligated to plead or prove that her marriage was not irretrievably broken. It would have been antithetical to Wife's position to do so. Husband, on the other hand, injected the issue of legal separation into the case by denying in his amended answer that the marriage was irretrievably broken. Husband's action constituted a request in his pleading for a legal separation. The evidentiary support for the court's finding that the marriage was not irretrievably broken came from Husband, since it was he who was advocating that position at trial. Finally, Husband's assertion that § 452.320.2(1) required the court to dismiss the action is misplaced. Prior to the 1998 amendment of § 452.305, the dismissal language in § 452.320 served a purpose because a trial court could not grant a decree of dissolution or legal separation if the court found that the marriage was not irretrievably broken. After the 1998 amendment, however, the references in § 452.320 to dismissal of the action are in direct conflict with the later-enacted provisions of § 452.305.2. To that extent, these provisions of § 452.320 were impliedly repealed and are no longer effective. *Colabianchi v. Colabianchi,* 646 S.W.2d 61, 63 (Mo. banc 1983). Points I and II are denied.

■ In Husband's third point, he contends the trial court erred in overruling his motion to stay the proceedings pending the determination of Wife's mental capacity in a guardianship or conservatorship

thorized the trial court to grant any relief at all.

proceeding. "The granting or refusing of a stay of proceedings rests in the trial court's discretion, the exercise of which will not be disturbed on appeal unless clearly abused." *Green v. Miller*, 851 S.W.2d 553, 556 (Mo.App.1993); *Lodigensky v. American States Preferred Ins. Co.*, 898 S.W.2d 661, 667 (Mo.App.1995). "An abuse of discretion occurs when a trial court's ruling is clearly against the logic of the circumstances and is sufficiently arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *In re Marriage of Michel*, 142 S.W.3d 912, 917–18 (Mo.App. 2004). Husband argues the trial court abused its discretion in overruling his motion for a stay because the appointment of a guardian or conservator was necessary to determine whether dissolution of marriage was in the best interests of Wife, in that she was incompetent to make such determination on her own. We disagree.

Before ruling on the motion to stay, the trial court had the benefit of two different mental examinations of Wife. Wife's expert, Akeson, concluded that Wife maintained marginal judgment skills and was competent to proceed in a civil case with the assistance of legal counsel. Husband's expert, Whetstone, reached a similar conclusion and stated that "I believe her decision to seek divorce is her own and should be respected as such." Furthermore, it was up to the trial court to determine Wife's competency in this proceeding. *Clark v. Reeves*, 854 S.W.2d 28, 30 (Mo. App.1993). When Wife was called to testify, Husband could have objected if he believed she was incompetent to testify. By failing to do so, he waived any objection on that ground. *Plunk v. Hedrick Concrete Products Corp.*, 870 S.W.2d 942, 945 (Mo. App.1994). In any event, the modern trend is to admit testimony from persons suffering from mental conditions, except in extreme cases, and allow the fact-finder to consider what effect the condition has on the witness' powers of observation, recollection and communication. *Turnbo by Capra v. City of St. Charles*, 932 S.W.2d 851, 855 (Mo.App.1996). The trial court was able to assess Wife's demeanor, memory, communication skills and other factors affecting her credibility. It is evident that the court did consider such factors in determining whether a dissolution of the parties' marriage was appropriate. We conclude that the trial court's ruling on the motion to stay was neither clearly against the logic of the circumstances nor so arbitrary and unreasonable as to indicate a lack of careful consideration. Therefore, the ruling was not an abuse of discretion. Point III is denied.

The trial court's decree of legal separation is supported by substantial evidence, is not against the weight of the evidence and does not erroneously declare or apply the law. The judgment is affirmed.

GARRISON and BARNEY, JJ., Concur.