SE CO–OP SERVICE COMPANY,
Plaintiff–Respondent,

v.

James HAMPTON, Defendant–
Appellant.

No. 28389.

Missouri Court of Appeals,
Southern District,
Division Two.

July 21, 2008.

Motion for Rehearing and Transfer
Denied Aug. 29, 2008.

Application for Transfer Denied
Sept. 30, 2008.

Daniel P. Card II and Benicia Baker-Livorsi, The Family Law Group, L.L.C., St. Charles, MO, and Kevin F. Hennessey, Chesterfield, MO, for appellant.

Mayer S. Klein and Michael J. Payne, Frankel, Rubin, Bond, Dubin, Siegel & Klein, P.C., St. Louis, MO, for Respondent.

GARY W. LYNCH, Chief Judge.

SE Co–Op Service Company ("SE Co–Op") filed a petition in the Circuit Court of Stoddard County seeking damages against James Hampton ("Hampton") pursuant to a Charge Account Agreement entered into between the parties. Hampton counterclaimed for breach of contract and negligent workmanship. Following a bench trial, the trial court found in favor of SE Co–Op on its petition and on Hampton's counterclaim. Hampton appeals, contending the trial court erred in entering judgment against him on SE Co–Op's petition based upon his failure to plead any affirmative defense, because his counterclaim should have been considered an affirmative defense in accordance with Rule 55.08.[1] Hampton also contends the trial court erred in entering judgment against him on his counterclaim because the judgment is against the weight of the evidence. SE Co–Op filed a motion for attorney fees and costs on appeal pursuant to the terms of the Charge Account Agreement. We affirm, grant SE Co–Op's motion and remand for a hearing on the reasonableness of the requested attorney fees and costs.

### Factual and Procedural Background

Hampton controls a farming operation encompassing approximately 1,400 acres in both Stoddard and New Madrid counties. In 2003, he ordered fertilizer, chemicals and spreading services from SE Co–Op for his cotton farms. The order was placed pursuant to a Charge Account Agreement he had entered into with SE Co–Op the year before. In late June or early July of 2003, Hampton noticed "irregularities" on five of the farms on which SE Co–Op had either spread fertilizer or provided equipment to spread fertilizer: Ida Hill, Willie's West, Magor's, Mouser and Day Farm.

1. All references to rules are to Missouri Court Rules (2007).

Hampton expressed to SE Co–Op's manager, Scott Arnold, that he believed the "irregularities" on those five farms were the result of fertilizer misapplication by SE Co–Op and that he did not want to pay. In August of 2003, Arnold agreed to create a sub-account for the charges for those farms. Mike Galloway, SE Co–Op's general manager, agreed that no interest would be charged on the sub-account until harvest, when Hampton would assess whether he suffered any damages. If it turned out that Hampton did not suffer any damage, he would pay the sub-account. The balance on the main Charge Account Agreement, however, would continue to incur finance charges for amounts that were thirty days past due.

The last payment that Hampton made on the main Charge Account Agreement was in September of 2003. Hampton never made a payment on the sub-account. As of September 18, 2003, the balance on the main account was $6,434.73, and the balance on the sub-account was $6,441.77.

Following Hampton's refusal of its demand for payment, SE Co–Op filed the instant lawsuit seeking the $12,876.50 due under the accounts, plus interest, as well as attorney's fees. Hampton did not file an answer to SE Co–Op's petition nor otherwise specifically plead any affirmative defenses. He did file a counterclaim alleging breach of contract and negligent workmanship due to SE Co–Op's misapplication of fertilizer and sought $36,616.30 in damages.

At the bench trial, SE Co–Op offered in support of its petition the testimony of Arnold and Galloway and limited their direct examination to the facts surrounding the creation of the Charge Account Agree-ment, an explanation of its terms, and a discussion of what payments Hampton had made and the balance remaining on the account. During cross-examination of Galloway, Hampton's trial counsel[2] questioned him about the creation of the sub-account. Galloway stated the sub-account was created because of a "dispute . . . on a fertilizer order." Hampton attempted to question Galloway further about the merits of the dispute, but the trial court sustained SE Co–Op's objection that Hampton was going "outside the pleadings" to "discuss matters in his counterclaim."[3]

After SE Co–Op rested its case, Hampton, his father Allen Hampton, and soil fertility specialist Dr. Neil Kinsey testified on behalf of Hampton about the irregularities on the five farms and the alleged misapplication of fertilizer by SE Co–Op. Galloway testified on behalf of SE Co–Op in rebuttal. The trial court entered judgment in favor of SE Co–Op on both its petition and Hampton's counterclaim. The court found against Hampton on the petition, further noting that he "neither pleaded any affirmative defenses nor offered any evidence that would contradict the plain terms of [the] Charge Account Agreement or amounts due thereunder." On Hampton's counterclaim, the court found that he "failed to meet his burden of proof by a preponderance or otherwise of competent and substantial evidence that any damages he sustained to his crops were caused by [SE Co–Op]." This appeal followed.

### Standard of Review

Our review of a bench-tried case is governed by *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). Therefore, we will

---

2. Hampton's appellate counsel did not represent him at trial.

3. Hampton did not make any offer of proof and does not challenge this evidentiary ruling in this appeal.

affirm the trial court's judgment unless it is unsupported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law. *Id.* at 32.

The phrase "weight of the evidence" means its weight in probative value, rather than the quantity or amount of evidence. The weight of the evidence is not determined by mathematics, but depends on its effect in inducing belief. An appellate court exercises extreme caution in considering whether a judgment should be set aside on the ground that it is against the weight of the evidence and will do so only upon a firm belief that the judgment was wrong.

*Simpson v. Strong,* 234 S.W.3d 567, 578 (Mo.App.2007).

"As the trier of fact, it is the trial court's function and duty to assess the weight and value of the testimony of each witness." *O'Dell v. Mefford,* 211 S.W.3d 136, 141 (Mo.App.2007). Thus, in determining whether a judgment is against the weight of the evidence, "we must give due regard to the trial court's opportunity to judge the credibility of the witnesses." *Id.* "[T]he trial court is free to believe all, part, or none of a witness's testimony." *Heritage Roofing, LLC v. Fischer,* 164 S.W.3d 128, 132 (Mo.App.2005). We view the evidence and all reasonable inferences drawn therefrom in the light most favorable to the trial court's judgment.[4] *Id.* All contrary evidence and inferences are disregarded. *Id.*

### Discussion

In his first point relied on, Hampton contends the trial court erred in finding against him on SE Co–Op's petition for not pleading any affirmative defense, because his counterclaim should have been treated as an affirmative defense of equitable estoppel or recoupment in accordance with Rule 55.08, "in that the evidence clearly showed: (1) [SE Co–Op] was the first party to breach the contract . . .; (2) the breach was material; and (3) [Hampton] suffered significant *damage from* [SE Co–Op's] breach." (Emphasis added). In his second point relied on, Hampton contends the trial court erred in finding against him on his counterclaim, because the judgment is against the weight of the evidence with regard to Hampton's burden of proof on the issue of causation, in that Hampton presented "uncontroverted, competent and substantial evidence that [SE Co–Op's] failure to fertilize [Hampton's] fields in accordance with [Hampton's] requests and in a workmanlike manner *actually and proximately caused* the reduced cotton yield in the affected areas." (Emphasis added).

As framed by Hampton in his points, the issue of whether he was damaged as a result of SE Co–Op's misapplication of fertilizer, i.e., causation, is a common element of both his alleged affirmative defense and his counterclaim. The trial court determined that Hampton failed to carry his burden of proving this issue on his counterclaim. So, if the trial court did not err in the determination of this issue on the counterclaim, then an affirmative defense requiring a favorable determination on that same issue, even if considered as properly asserted by the counterclaim, must also fail. For this reason, our resolution of Hampton's second point adverse to him is dispositive of this appeal.

Because of evidentiary differences in the relevant circumstances related to each of the five farms, our analysis of the weight

---

4. Neither party requested the trial court to make findings on controverted fact issues as permitted by Rule 73.01(c).

of the evidence, as asserted in Hampton's second point, proceeds farm by farm:

### Ida Hill

■ Hampton spread the northeast and southeast portions of the Ida Hill farm with chicken litter to boost the nitrogen levels in those areas. Based upon this knowledge and information from soil reports, Hampton ordered specific varying amounts and types of fertilizer to be applied to various sections of the Ida Hill farm by SE Co–Op. SE Co–Op mistakenly began spreading the Ida Hill farm with fertilizer mixed and intended for a neighboring farm. The driver caught the mistake and then spread the entire Ida Hill farm with the correct fertilizer. Consequently, some portions of the Ida Hill farm received two applications of fertilizer (from SE Co–Op), and some portions received three applications of fertilizer (two from SE Co–Op, plus the chicken litter). Hampton contends the soil became overly fertilized as a result of the misapplication, causing the cotton plants to grow too tall with too much vegetation and unable to produce fruit. Hampton claims the only cause of cotton growing too tall is too much nitrogen. In support, he relies upon Dr. Neil Kinsey's expert testimony that putting too much nitrogen on the soil without sufficient amounts of copper and potassium will cause the cotton fruit to shed. Hampton contends "the facts of the misapplication are not in dispute" and "it was a completely foreseeable natural and probable consequence that [Hampton] would suffer some loss from the over-application of fertilizer."

SE Co–Op disagrees with Hampton's assessment that there is no dispute about the double application of fertilizer. Hampton's own testimony at trial was that SE Co–Op contacted him about the double application and told him the problem had been corrected. Hampton testified that SE Co–Op denied any problem as a result of the double application of fertilizer. SE Co–Op argues that its agreement to create the sub-account was not an admission of fault; it merely agreed to put the charges aside until harvest, when Hampton could attempt to prove his damages, if any.

SE Co–Op also disagrees with Hampton's contention that no evidence was presented to contradict his evidence. Viewing the evidence in the light most favorable to the trial court's judgment, as we are required to do, Hampton's claim was lacking in probative evidence in some respects, and probative evidence was presented by SE Co–Op to contradict Hampton's claim that SE Co–Op caused the damage to Ida Hill. *Simpson*, 234 S.W.3d at 578. Hampton and his father both acknowledged that, historically, Ida Hill was their worst producing farm. When directly questioned whether Ida Hill produced better in 2003 than it had in 2002, Hampton was unresponsive and could not remember what had been planted on the field in 2002. Hampton did not produce any yield records to support his claim that he was damaged. The northern portion of the farm where the chicken litter was spread is the area in which Hampton claims the cotton grew too tall and with too much vegetation. Neither Hampton nor Dr. Kinsey addressed the issue of whether the overgrowth of the cotton on the alleged affected area was a result of the fertilizer spread by SE Co–Op or the chicken litter applied by Hampton. Dr. Kinsey's testimony relied on by Hampton, that applying too much nitrogen to the soil without adequate amounts of potassium and copper will cause the cotton fruit to shed, was a general statement. No evidence was presented as to the amounts of potassium and copper present in the soil at Ida Hill, and Dr. Kinsey did not form any opinion as to the cause of the overgrowth at Ida Hill.

Accordingly, when viewing the evidence in the light most favorable to the trial court's judgment, we cannot say that the judgment was against the weight of the evidence with regard to the Ida Hill farm.

### Willie's West, Magor's and Day Farm

■ SE Co–Op spread the Willie's West, Magor's and Day Farm with the specific fertilizers ordered by Hampton. Subsequently, Hampton noticed some "streaking" in the plants at the Willie's West and Day Farm, where some rows were six to eight inches shorter and a different color from the other rows. At Magor's, one whole section of plants, as opposed to the "streaks" at the other farms, was shorter and discolored. Hampton told Arnold that he believed the problem resulted from SE Co–Op's misapplication of fertilizer and he did not want to pay. Hampton consulted with Dr. Kinsey, who photographed the fields and procured soil and plant samples for testing. Dr. Kinsey testified that, based on his soil analysis, the cause of the "streaking" problem was a lack of phosphorous and boron in the areas that were short. In his expert opinion, the only thing that would cause alternating rows of short and tall plants is "fertilizer pattern[.]"

SE Co–Op responds that Dr. Kinsey testified he took the soil samples in November of 2003, long after the 2003 growing season. The samples were taken in preparation for the 2004 growing season and could not accurately indicate what was on the fields in April or May of 2003. Dr. Kinsey testified that he did take some soil samples in July of 2003, which would be better indicators of what was actually applied to the field in April or May of 2003, but the reports on those samples were not produced at trial. On cross-examination, Dr. Kinsey stated he could not say that the "streaking" was caused by fertilizer, only

that it was caused by "fertility." He also admitted that there are other factors besides fertilizer pattern that could have led to the "streaking."

Hampton's father also acknowledged that there are other possible causes of decreased fertility that could cause the "streaking," including the growth of a cover crop. He stated that Hampton used wheat as a cover crop which depletes the nitrogen in the soil, and decreased nitrogen causes the discoloration of the cotton plants. Galloway testified about the "wheat pressure" on these farms that could cause the decreased fertility and the resulting "streaking" pattern. Using photographs that he took of these farms as an aid, Galloway described how the photographs show the wheat is planted in rows along side the cotton plants. The rows with no wheat in them contain green cotton plants, and the rows that have wheat growing in them have discolored plants. He explained that this straight-line pattern going right to the row could not be created by SE Co–Op's spreader trucks spreading the fertilizer, because the trucks throw a spread pattern that is over eighty-feet wide and is tapered on the edges, in a bell pattern. He stated that there is no possible way SE Co–Op's spreader trucks could have caused the straight-line pattern that goes right to the row of the cotton plants. The wheat puts pressure on the cotton plants when it "heads out" and depletes the nitrogen in the soil. The uneven spreading of the wheat from row to row— which SE Co–Op did not spread—would cause the straight-line "streaking" pattern.

Galloway also identified "weed pressure" in the photographs, where pigweed is growing twice as high as the cotton plants. He pointed out the "weed spectrum" in the photographs that varied from row to row, in a straight-line pattern. The rows with less pigweed have healthier plants. Gallo-

way stated that something must have been done to the soil in the past to create such a weed spectrum right to the row, such as applying chemicals like "Prowl," for example, but he could not say for sure what caused the weed spectrum because SE Co-Op did not do anything to the farm in previous years. Again, Galloway stated there is no possible way the weed spectrum could have been caused by SE Co-Op spreading fertilizer, because the trucks could not miss only a few rows at a time, patterned right to the row.

In one photograph which showed an area with a "streaking" pattern that was not in straight lines, Galloway explained that it was a low end of the field. He explained that low ends in a field typically have a problem with standing water, which leaches nutrients out of the soil and will cause the plants to be more yellow. Hampton and Dr. Kinsey acknowledged that standing water depletes the nitrogen in the soil.

Hampton testified that the problem he had on the Day farm was delayed maturity; he had to come back after the initial harvest and pick the "strips." A weather report prepared by the National Agricultural Statistics Service (NASS) describing the above-average rainfall Missouri experienced in 2003 was offered and admitted into evidence. The report states:

> Repeated heavy rains in the Bootheel sharply delayed cotton planting but farmers caught up to just over a week late, at 90 percent complete by the end of May.... *The cotton harvest proceeded more slowly and extended into December due to some fields being exceptionally late maturing and the repeated heavy rains in the Bootheel.* November rainfall averaged 3.95 inches, up sharply from the 3.16 inch average. December averaged 3.29 inches, also well above the

2.67 inch 30–year average. (Emphasis added).

Hampton argues that Galloway's testimony about the wheat, spread patterns of the fertilizer trucks and weeds was not credible. The trial court has absolute discretion to judge the credibility of witnesses, and we must defer to the trial court's determinations of credibility. *O'Dell,* 211 S.W.3d at 141. The trial court may believe all, part or none of a witness' testimony. *Heritage Roofing, LLC,* 164 S.W.3d at 132. In this case, the trial court implicitly did not find Hampton's evidence credible. Viewing the evidence in the light most favorable to the judgment, Hampton's evidence is contradicted by substantial probative evidence showing other possible causes for the "streaking" patterns on Willie's West, Magor's and Day Farm. Moreover, Hampton did not produce any yield reports for any of these farms for 2003 to document his claim for damages. In judging his credibility, the trial court was free to disbelieve his unsupported testimony of yield estimates. *Id.* We cannot say that the trial court's judgment is against the weight of the evidence with respect to Willie's West, Magor's or Day Farm.

### Mouser

Hampton rented a tractor-pulled buggy from SE Co-Op which he drove himself to spread fertilizer on two sections of the Mouser farm. The wind was blowing very hard, so Hampton periodically stopped to check if the fertilizer was covering properly. Hampton did not think that the fertilizer was spreading properly, so he had his father come out to look at the buggy. His father found that the buggy had a broken belt and called someone from SE Co-Op to come out and fix it. Someone came out to fix it and discovered the fins on the spreader had been put on back-

wards. Before changing the fins, however, Hampton's father re-spread the entire farm in an attempt to "blend in" the thin areas. The cotton plants in the two sections which Hampton had spread exhibited "streaking," where certain rows of plants were shorter and a different color from other rows. Hampton claims these inferior-producing plants were the result of the broken spreader provided by SE Co–Op.[5]

SE Co–Op responds that Hampton testified he had very limited experience in operating a buggy. Hampton had operated a buggy five times or less in his entire farming career. And of these five or less times of operating a buggy, he mostly spread wheat, not fertilizer. Hampton also testified that he had no idea what spread pattern he needed to be looking for while he was pulling the buggy. Further, the high winds that day could have affected the spread pattern. Hampton was not able to identify whether the buggy was a PTO or a ground-driven implement, which in the latter case needs to be driven at a specified speed in order to obtain the appropriate spread pattern.

Viewing the evidence in the light most favorable to the judgment, there is substantial probative evidence that the alleged mis-spread fertilizer resulted from Hampton's inexperience in operating a buggy, as opposed to faulty equipment. *Simpson*, 234 S.W.3d at 578. Although he stated that he was able to immediately tell that the spreading was off, Hampton continued to spread sixty acres, amidst the high winds. His father then re-spread the farm, and did so without changing the fins, which he knew at that time were on backward. Considering this evidence, along with the above-mentioned evidence of other possible causes for the "streaking" pat-

tern and Hampton's failure to produce any yield reports as documentary proof of his damages, we cannot say that the trial court's judgment is against the weight of the evidence with respect to the Mouser farm.

We find that the trial court's judgment finding Hampton did not satisfy the burden of proof as to causation on his counterclaim is not against the weight of the evidence. Consequently, Hampton's failure to prove causation on his counterclaim, even if the trial court treated his counterclaim as asserting an affirmative defense, would have also defeated that alleged affirmative defense. Points I and II are denied.

### Attorney Fees and Costs on Appeal

■ Pursuant to the terms of the Charge Account Agreement, SE Co–Op filed a motion for attorney fees and costs incurred in connection with this appeal. Hampton did not file any suggestions in opposition to SE Co–Op's motion, which this Court ordered taken with the case.

■ "Attorney fees may be awarded on appeal if they are based on a written agreement that is the subject of the issues presented in the appeal." *American Nat. Ins. Co. v. Noble Communications Co., Inc.*, 936 S.W.2d 124, 134 (Mo.App.1996). The Charge Account Agreement requires Hampton to pay "any reasonable attorney's fees or collection costs" if he fails to pay his account within the terms of the Agreement. Accordingly, SE Co–Op's motion is sustained. We have the expertise and authority to fix the amount of attorney fees on appeal. *Rosehill Gardens, Inc. v. Luttrell*, 67 S.W.3d 641, 648 (Mo.App. 2002). However, because the trial court is

---

**5.** Hampton identifies a separate issue of fertilizer misapplication on the Mouser farm in his brief, but the only issue he is seeking compen-

sation for is the streaking allegedly caused by the broken buggy. We, therefore, need not address the second issue.

in a much better position to hear evidence and argument on this issue and make a determination of the reasonableness of the requested fees and costs, we prefer, in this case, to defer our authority to the trial court. *Id.* Therefore, upon remand, the trial court is directed to conduct a hearing to determine the reasonableness of the attorney fees and collection costs requested on appeal by SE Co-Op and enter judgment accordingly.

### Decision

The judgment of the trial court is affirmed. The cause is remanded to the trial court with directions to conduct a hearing to determine the reasonableness of the attorney fees and collection costs requested on appeal by SE Co-Op, and to enter judgment accordingly.

BARNEY, P.J., and RAHMEYER, J., concur.