Harry DeMEAN and Dorothy DeMean,
Plaintiffs–Appellants,

v.

Diana Sue LEDL, a/k/a D. Ledl, a/k/a
D.S. Ledl and D.S. Ledl & Associates,
and United Fire & Casualty Company,
Defendants–Respondents.

No. 16409.

Missouri Court of Appeals,
Southern District,
Division Two.

Sept. 27, 1990.

Stephen P. Seigel, Springfield, for plaintiffs-appellants.

Will Fletcher, Springfield, for defendants-respondents.

SHRUM, Judge.

Plaintiffs' Harry and Dorothy DeMean appeal from the judgment of the trial court entered in favor of defendant Diana Sue

Ledl following jury verdict in her favor on plaintiffs' claim [1] that defendant had paid herself more money than a written employment agreement entitled her to. After a motion for new trial was overruled, this appeal followed.

Plaintiffs owned an office building [2] in Springfield, Missouri, and had hired defendant in December 1982, pursuant to a written contract, to manage the building. Only one written contract existed. No written modification of the agreement occurred. Plaintiffs' suit claimed defendant, in managing the office building, took money in excess of that agreed to in the written contract as her management salary or fee. Defendant contended the original written agreement was modified by oral agreement, or by implied consent, of plaintiffs.

The written contract provided that in exchange for defendant's full time employment in the management of plaintiffs' office building, defendant was to be paid $550.00 per month base salary, a monthly bonus not to exceed $600.00 per month based on the occupancy rate of the building, and a $25.00 monthly gasoline allowance. Defendant was to devote her full time to plaintiffs' business. Despite that provision, defendant took on the management of other properties beginning in 1983. She claimed she undertook management of additional properties with the full knowledge of plaintiffs, and that plaintiffs had told her on numerous occasions that so long as she took care of their interests and tried to minimize expenses, anything else she did was her business. The written employment agreement did not detail or spell out what defendant was to do in the management of the office building. How-

ever, defendant's duties, as they evolved, included hiring and payment of personnel necessary to maintain, clean and run the building. From time to time she would hire others to maintain the building, such as carpenters for remodeling. Defendant paid those individuals from the rental proceeds of the building, although the written agreement did not specifically authorize her to do so. Initially, defendant opened a checking account in the name of Courtyard Office Center; defendant was authorized to use this account and, in fact, maintained the checkbook for the account. It was into this account that defendant initially deposited rents and out of which she paid all expenses incurred on behalf of the Courtyard Office Center, including her management salary, bonus and gasoline allowance.

In February 1985, defendant visited plaintiffs at their Iowa home. Recollections of the business discussions held during that visit are disparate. Plaintiffs recalled defendant talking about starting her own management firm and wanting plaintiffs as one of her clients. Plaintiffs say their response was that she had to put something in writing that they could look at and agree to in order to make it work. They claim that when defendant left their home, they were still operating under the written agreement and that they never orally agreed with defendant to change defendant's pay. Defendant claimed that she went to Iowa on February 27, 1985, for the purpose of going over some changes with plaintiffs and to get their approval of some changes she wanted to make in the system. When asked to explain, defendant said she was referring to the accounting system

---

**1.** Count I of plaintiffs' petition, the verdict director (Instruction No. 6), and Verdict Form A make it less than clear what theory plaintiffs submitted their case on. In paragraph 4 of Count I, plaintiffs allege defendant "breached the terms and conditions of" the employment agreement and also "negligently mismanaged [the] office building in one or more of the following ways...." There then followed 16 paragraphs of factual allegations. The verdict director was a not-in-MAI instruction. It was not taken from the MAI 26 (verdict directing—contract) series of instructions. It was not a modified MAI 26 instruction. Plaintiffs' verdict director bespeaks a submission on a theory of

conversion in keeping with the not-in-MAI instruction approved in *Boyd v. Wimes,* 664 S.W.2d 596 (Mo.App.1984). Verdict Form A prepared by plaintiffs reads: "On the claim of Plaintiffs ... *for breach of contract* against Defendant...." In oral argument, plaintiffs' counsel conceded that he had used the "conversion" verdict directing instruction approved in *Boyd v. Wimes, supra,* as a guide in preparing Instruction No. 6.

**2.** The office building was known as Courtyard Office Center.

change. This was a change wherein all of the rental income from plaintiffs' property ceased going into the plaintiffs' Courtyard Office Center account but, rather, was to be placed into defendant's management company trust account. From defendant's trust account the expenses previously paid out of plaintiffs' Courtyard Office Center account would be paid, defendant's new management fee would be paid, and the balance would be paid to plaintiffs.

Defendant also testified that during her visit, she and plaintiffs agreed that: (a) she would no longer be on a salary, but would collect 8 percent of the gross income as her management fee; (b) payments on leased equipment (a typewriter, answering machine and pager) which had previously been leased on behalf of plaintiffs would be taken over by defendant who would make the balance of the lease payments but would then be entitled to the equipment; (c) the maintenance men and janitor would be paid out of defendant's trust account as would the employees' withholding taxes and workman's compensation; and (d) defendant was to begin paying for the telephone system that was in the office complex.[3] Summarizing, defendant said:

A. ... [W]e made a certain set of agreements at our meeting on February 28th in their home. I spent the night there, we came up to our conclusions of what we were going to do from there on, they were happy, agreeable, I was happy and agreeable, I would have liked it in a contract but Harry and I did business on handshakes and this was very important to him. And we shook hands at their kitchen table on this agreement that we had made.

Q. After you went back ... did you start that new system?

A. Yes, I did.

Upon her return to Springfield from Iowa, defendant instituted the new accounting system, began paying herself the 8 percent management fee, and began to engage in activities which defendant claims were agreed to in the Iowa meeting. Plaintiffs deny any such agreement was made, and that they continued in the belief that the office building was being managed by defendant under the original written employment agreement.

Throughout the period defendant managed the office building for plaintiffs, she sent them detailed financial records each month relating to the Courtyard Office Center operation. Defendant continued to furnish monthly financial statements to plaintiffs after the February 1985 meeting in Iowa. Those monthly financial statements detailed the income and expenses, including the increased management fees being received by defendant, the lack of lease payments on the leased equipment, and other changes in the management arrangement which defendant claimed had been agreed to in the February 1985 meeting in Iowa. Throughout their relationship, there were monthly telephone conversations between the parties about the business and that continued after the February 1985 meeting in Iowa.

Plaintiffs acknowledged receiving the monthly financial statements and noticed that the accounting was different as of April or May 1985. Plaintiffs were in Springfield in May at which time plaintiffs asked defendant about what she was doing. Plaintiff Dorothy DeMean testified that defendant told her "she was combining different things and paying them herself with our funds ... she was taking like the typewriter and the answer machines and those type of things and she was paying them with our money.... I didn't know how she did it." When asked if August was when "the whole problem" began, plaintiff Harry DeMean said:

A. No, about March, about the 1st of March because she come [sic] there in February and after she went home first part of March, then she started to changing her bookkeeping.

\* \* \* \* \* \*

---

**3.** The testimony of defendant that the written employment agreement was modified by "verbal agreements" made between the parties during the February 1985 meeting in Iowa, was presented to the jury *without any objection* by plaintiffs.

Q. ... I thought your testimony was March is when it started to occur, the problems?

A. That's right, I didn't know what the problems were because it was a lot different kind of a calculation than we had before.

Q. That's what I'm saying.

A. Yeah.

Q. Mr. DeMean, the calculations were raising a problem?

A. Yeah, they were.

Q. And one of the problems was, Dee Ledl was taking more management fee, was that not one of the problems?

A. Well, I would say that was one of the problems.

Plaintiffs acknowledged that frequent telephone conversations occurred in which a variety of topics were discussed both before and after the February 1985 visit by defendant in Iowa. For example, plaintiff Dorothy DeMean testified, in part:

Q. Mrs. DeMean, when you received that accounting showing that Dee was taking out more for management fee you did call her, did you not?

A. [by Mrs. DeMean] I asked her—first thing that I asked her about was when I got the accounting for the end of March and I noticed there was discrepancy between the balance ending of February and the 1st of March, and I called her and asked her about it.

Q. Okay, and you asked about it. Did she tell you what it was about.

A. No, she didn't.

Q. She did not tell you?

A. No, she said, "I have to go back through my books and figure out what I did and get back in touch with you."

Q. You didn't ask her about this management—change in the management conditions?

A. Well, *I think that I caught that and that threw me off of the rest.* (Emphasis added.)

When asked if she knew, as of March or April 1985, that the employment contract had been changed, Mrs. DeMean said:

Well, it got changed but not so that we understood it, we understood it from— it came from two different sources. One minute she was paying for these things, the next minute we're paying for them but she's claiming them.

Plaintiffs claimed they first learned defendant had set up her own management company in August 1985 when they visited Springfield and found that she had moved to another office located outside plaintiffs' building. However, from the beginning of the parties' relationship, defendant had a company named D.S. Ledl & Associates and displayed a sign advertising her company on her office door at Courtyard Office Center. Plaintiffs first learned in September 1985 that on April 30, 1985, defendant had discontinued filing state tax forms relative to the office building in plaintiffs' name and had commenced filing them in the name of defendant's management company. She had signed those documents on behalf of plaintiffs as "manager." According to plaintiffs, upon further investigation they determined that beginning in March 1985, defendant began to pay herself more than was provided for in the written contract. They found that defendant had closed out plaintiffs' bank account and placed the money in the account of D.S. Ledl & Associates. By letter dated July 22, 1985, defendant notified tenants of Courtyard Office Center that she would no longer be managing the building after September 1, 1985, because of the scheduled sale of the building.[4] Although a July 22, 1985, letter was shown to have been sent to plaintiff Harry DeMean, the plaintiffs testified they first became aware of the letter on August 29, 1985, and that it was at that time that plaintiffs "accepted her letter of resignation." Plaintiffs had objections to the way defendant was managing the office building before August 1985 but those objections were "not serious enough that we got into any heated discussion with her or anything like that." At trial, plaintiffs offered evidence that defendant had taken $32,212.87 more than that which was owed by plaintiffs under the written contract.

---

4. The building was not actually sold until June 20, 1986.

The jury's verdict was in favor of defendant.

█ Upon appeal, plaintiffs' sole claim of error is the giving of a not-in-MAI instruction (No. 8) which read as follows:

Your verdict must be for the Defendant if you believe either:

First, Plaintiff's [sic] entered into a verbal agreement authorizing Defendant to act for Plaintiffs in the capacity of a Property Management Company and that Defendant did not take any funds above that authorized by the new verbal agreement; or

Second, the conduct of the Plaintiffs through their inaction in failing to terminate the employment agreement, and their subsequent silence in not questioning the Defendant's action gave their implied consent for Defendant to conduct the management of Courtyard Office Center and to take sums above the original employment agreement.

Specifically, plaintiffs' initial claim of error is that the term "verbal agreement" in paragraph First of said instruction is a conclusion, not an ultimate fact, and gave the jury a roving commission to speculate as to what facts or terms, if any, of said alleged verbal agreement might constitute a legal defense to plaintiffs' claim. Summarized, plaintiffs claim the alleged verbal agreement should have been hypothesized in the converse instruction.[5]

█ The language of Instruction No. 8 is that of an affirmative converse. The characteristics of an affirmative converse are use of the words, "If you believe." *Powers v. Ellfeldt*, 768 S.W.2d 142, 145 (Mo.App. 1989). An affirmative converse, unlike a true converse, should not and does not use the same language submitted by plaintiffs' verdict director. *Cowell v. Thompson*, 713 S.W.2d 52, 55 (Mo.App.1986). An affirmative converse instruction requires that the

defendant submit a hypothesized ultimate issue which, if true, would defeat the plaintiffs' claim. MAI 33.05(1), Notes On Use (1988 New); *Morse v. Johnson*, 594 S.W.2d 610, 614 (Mo.banc 1980); *Powers v. Ellfeldt, supra,* at 145. Plaintiffs here contend Instruction No. 8 was prejudicially erroneous because it did not require the jury to find the terms of the "verbal agreement"; therefore, no facts from which the jury could be guided as to specifically what the "new verbal agreement" was supposed to be with respect to the authorized taking of funds. In this case the issue ultimately presented to the jury by the instructions was whether or not defendant was to be paid under the written employment agreement or was to be paid pursuant to a verbal modification of the employment contract. Evidence on other issues was presented by both parties to the jury, but when the verdict director was proffered by plaintiffs (and given by the trial court) the ultimate issue hypothesized was whether or not defendant paid herself money in excess of the sums authorized by the written employment contract. The plaintiffs' verdict director (Instruction No. 6) read as follows:

Your verdict must be for plaintiffs against defendant ... if you believe:

First, that plaintiffs authorized defendant ... to collect their rental income from the Courtyard Office Center for them, and to use a portion of said monies to pay herself a sum of money not to exceed $1,150.00 per month as her compensation for management services to be rendered by her to plaintiffs pursuant to the terms of an Employment Agreement dated December 16, 1982 entered into between said defendant and plaintiffs, and

Second, defendant ... used said rental income to pay to herself, or on her be-

---

5. The written employment agreement contained provisions requiring any modification of the contract and any waiver of provisions to be in writing. Plaintiffs make no claim upon this appeal that oral modification or waiver of provisions was impossible. "[P]arties to a contract *cannot,* even by an express provision in that contract, deprive themselves of the power to

alter or vary or discharge it by subsequent agreement. *An express provision in a written contract that no recision or variation shall be valid unless it too is in writing is ineffective to invalidate a subsequent oral agreement to the contrary ....*" (Authority cited.) *Fritts v. Cloud Oak Flooring Company,* 478 S.W.2d 8 (Mo.App. 1972). (Emphasis added)

half, sums of money exceeding $1,150.00 per month as authorized by the terms of said Employment Agreement, and

Third, plaintiffs were thereby damaged.

Unless you believe that plaintiffs are not entitled to recover by reason of Instruction No. 8.

The verdict director limited its ultimate hypothesized facts to issues which were not disputed by defendant. Defendant admitted signing the contract; she admitted what her compensation was to be under the terms of the written contract. Thus, paragraph First of Instruction No. 6 was undisputed. The defendant's evidence and her proffer of Instruction No. 7 clearly serves as an admission that she paid herself sums greater than that authorized by the written employment contract. Accordingly, paragraph Second of Instruction No. 6 was undisputed. Possible non-performance by defendant of her other contract obligations under the written contract (except for the amount of payment) are not presented to the jury by the verdict director. The ultimate issue (which if true) defendant proposed would defeat plaintiffs' submission was that the written contract had been modified (in this instance by an alleged verbal agreement) so as to provide for increased fees, and that defendant had taken nothing above the increased fees provided in the verbal agreement. The question that must be determined is whether or not Instruction No. 8 properly hypothesized those ultimate issues. This court concludes that the ultimate issues were not properly hypothesized by Instruction No. 8 and that the instruction was erroneous. However, this court finds the error is not prejudicial under the unique and special facts of this case.

Instruction No. 8 is erroneous for the following reason: It hypothesizes that "[p]laintiffs entered into a verbal agreement *authorizing Defendant to act for Plaintiffs in the capacity of a Property Management Company ...*" but the italicized portion of such instruction does not hypothesize that the verbal agreement authorized defendant to take an increase in management fees. The italicized portion of Instruction No. 8 was not necessary. It was surplusage. It was essential, however, that the jury be presented the ultimate issue; i.e., if a verbal agreement existed, did it authorize defendant to charge increased fees for her management services? In *Lawrie v. Continental Cas. Co.,* 555 S.W.2d 347 (Mo.App.1977), the following verdict director was given:

Your verdict must be for plaintiff if you believe:

First, defendant agreed to pay plaintiff a commission of 5% of the monthly earned premiums on the ... policies issued to Local 1464 for so long as the initial policies or renewals thereof remained in force, and

Second, the initial ... policies or renewals thereof remained in force from December 1, 1966 to September 30, 1972, and

Third, defendant failed to pay plaintiff a commission of 5% of the monthly premiums earned after June 30, 1968, and

Fourth, plaintiff was thereby damaged.

Defendant offered an affirmative converse instruction (Instruction No. 4) which read:

Your verdict must be for defendant if you believe that plaintiff was not entitled to commissions after June 30, 1968. M.A.I. 33.05.

*Lawrie, supra,* at 350. The court held the instruction was prejudicially erroneous:

The difficulty with Instruction 4 is that it lacks the required hypothesis. *Oliver v. Bi–State Dev. Agency,* 494 S.W.2d 49 (Mo.1973). The pleadings, the evidence, and the verdict-directing instruction, No. 3, demonstrate that the ultimate issue was whether there was an agreement between Mr. Lawrie and Continental for Continental to pay him commissions on insurance in force after June 30, 1968. Instruction No. 3 permitted a conclusion limited to that hypothesis of fact. An MAI 33.05 converse to fit this situation might well have read: "Your verdict must be for defendant if you believe defendant did not agree to pay commissions after June 30, 1968," or "Your ver-

dict must be for defendant if you believe there was no agreement between plaintiff and defendant for payment of commissions after June 30, 1968." Instead, the jury was permitted the ultimate conclusion whether plaintiff was "entitled" to commissions after June 30, 1968, without defining "entitled" and without limiting entitlement to a hypothesis which would defeat plaintiff's claim.

*Lawrie v. Continental Cas. Co.,* at 350.

■ In this case, requiring the jury to find that a verbal agreement was reached without hypothesizing that the verbal agreement reached authorized defendant to charge greater fees was erroneous. This court, however, finds the error is not prejudicial in this unique situation. The remaining portion of paragraph First of Instruction No. 8 did hypothesize, in a backhanded fashion, the fact that the verbal agreement altered the management fee schedule.

First, Plaintiffs entered into a verbal agreement ... *and that defendant did not take any funds above that authorized by the new verbal agreement ....* (Emphasis added.)

This was not a case where the terms of one agreement were ambiguous or disputed. Rather, the ultimate issue was whether a subsequent verbal agreement authorized defendant to charge greater fees and whether or not the money she took was authorized by such new agreement. Defendant offered evidence in support of that ultimate fact. Defendant's testimony was received without objection. Defendant's evidence as to what she claimed the verbal agreement to be was undisputed. Plaintiffs vehemently denied there was a verbal agreement. Accordingly, under the instructions submitted, the parties presented an "all or nothing" decision to the jury. The goal of MAI is to leave evidentiary detail to the argument of counsel and to submit only the ultimate issues for the jury's resolution by simple and concise instructions. *Kraus v. Kraus,* 693 S.W.2d 869, 873 (Mo.App.1985). Reversal for instructional error should occur only when it is found that the instruction contains an error of substance with substantial

potential for prejudicial effect. *Fowler v. Park Corp.,* 673 S.W.2d 749, 755–56 (Mo. banc 1984); *Kraus v. Kraus, supra,* at 873–74.

In this case, the jury was required by the instruction to find that a subsequent verbal agreement had been made in order to find for the defendant. The instruction should have, additionally, included a direct hypothesis that the "new verbal agreement" modifying the written contract authorized increased fees to be received by defendant. However, the terms of that subsequent verbal agreement (if found to exist) were not disputed. In the jury instruction conference, plaintiffs' counsel did object to Instruction No. 8. Specifically, as to paragraph Second of the instruction, he made the objection that it gave "the jury a roving commission to speculate what action would be a defense." However, as to paragraph First, no such specific objection was made. He did not point out to the trial court the error in paragraph First which he now complains of. Careful reading of plaintiffs' motion for new trial leaves serious doubt whether this particular objection was raised at that stage of the proceeding.

■ In cases such as this, where the challenged instruction is not subject to the requirements of MAI, guidelines have evolved to resolve disputes over such instructions. *Wilson v. Bob Wood & Associates, Inc.,* 633 S.W.2d 738, 750 (Mo.App. 1981). Those guidelines include the rule that to reverse a jury verdict on the ground of instructional error, it must appear that the offending instruction misdirected, misled, or confused the jury; and, the burden to prove the proposition rests with the party challenging the instruction. *Cornell v. Texaco, Inc.,* 712 S.W.2d 680, 682 (Mo.banc 1986); *Wilson v. Bob Wood & Associates, Inc., supra,* at 750–51. The second paragraph of Instruction No. 8 is not a model to be used, but under the facts of this case, this court believes the jury was not misled, misdirected, or confused by the instruction. Plaintiffs' claim of error as to paragraph First of Instruction No. 8 is rejected.

■ Additionally, plaintiffs' claim error in paragraph Second of Instruction No. 8.

Their initial complaint is with the use of the term "in not questioning the defendant's action." Plaintiffs say that term is confusing, vague, indefinite, and misleading and gave the jury a roving commission to speculate as to what action of defendant the plaintiffs should have been questioning and that the instruction should have hypothesized the specific actions which were supposed to be questioned by plaintiffs. Such argument is not sound. Clearly, the "defendant's action" was the taking of the money. That was the cornerstone of their complaint. The record was clear from the evidence and the verdict directing instruction that the action of the defendant which plaintiffs' questioned was the taking of money over and above that authorized by the written employment contract. That argument is without merit.

Next, plaintiffs contend paragraph Second of Instruction No. 8 erroneously hypothesized that plaintiffs had a legal duty to terminate the employment agreement. That argument is also without merit. The language "conduct of the Plaintiffs through their inaction in failing to terminate the employment agreement" did not impose a duty on plaintiffs to terminate defendant. It was a fact which the jury could properly consider in its resolution of the ultimate hypothesized fact that plaintiffs impliedly consented to defendant's taking additional sums above that authorized by the written contract. If plaintiffs consented to the taking of the money, there was no unauthorized taking; hence, no conversion. That consent can either be express or implied. *Maples v. United Sav. and Loan Ass'n*, 686 S.W.2d 525, 527 (Mo. App.1985). " 'Implied consent' is that manifested by signs, actions or facts, *or by inaction or silence which creates an inference that consent has been given. State v. Stanfield*, 1 S.W.2d 834, 836 (Mo. 1927)." *Id.* at 527 (emphasis added). This prong of plaintiffs' attack on Instruction No. 8 is rejected.

■ Finally, plaintiffs argue that in attempting to hypothesize the defense of implied consent to defendant's breach of contract, the instruction erroneously failed to hypothesize all legal elements of such defense, including the element that plaintiffs had knowledge that defendant was breaching the terms thereof, and with such knowledge, consented to the breach. The only case cited by plaintiffs in support of their complaints as to paragraph Second of Instruction No. 8 is *State ex rel. Burgess v. Neaf*, 439 S.W.2d 190 (Mo.App.1969). That case does not in any way aid plaintiffs. As earlier noted, the plaintiffs chose to submit their verdict director on a theory of "conversion" and used a not-in-MAI instruction taken from *Boyd v. Wimes, supra*. It is clear from the record of the jury instruction conference that defendant was relying upon *Maples v. United Sav. and Loan Ass'n., supra*, as authority for giving the second paragraph of the affirmative converse Instruction No. 8. In *Maples, supra*, plaintiffs sought damages claiming defendant had converted personal property belonging to them. This had allegedly occurred after defendant had foreclosed a deed of trust on plaintiffs' home and removed their furniture. The evidence was substantially in conflict about the discussions between the parties concerning the furniture. An affirmative converse instruction was given which read, in part, as follows:

> Your verdict must be for defendant if you believe either:
>
> \* \* \* \* \* \*
>
> Second, the conduct of plaintiffs implied their permission for defendant to take the property referred to in evidence.

*Maples, supra*, at 527. Plaintiffs argued in *Maples* (as is argued here) that the instruction was erroneous because it did not require a finding that plaintiffs had knowledge that their property was subject to being taken. The court rejected that argument saying:

> If appellants' conduct implied permission for respondent to take their property, it does not matter what appellants' actual knowledge may have been. This is similar to apparent mutual assent required to have a contract. That assent is not determined by the state of mind, but by the conduct of the parties

and the language employed by them, judged by a reasonable standard. *Roper v. Clanton*, 258 S.W.2d 283, 289 (Mo. App.1953); *Longmire v. Diagraph–Bradley Stencil Mach. Corp.*, 176 S.W.2d 635, 646 (Mo.App.1944); 17 Am Jur., Contracts, § 19, pg. 355.

*If respondent believed and it reasonably appeared to respondent that appellants were assenting to the taking of their property, then respondent was not guilty of conversion.* Whether that occurred or if there was evidence to support the instruction is not before us.

*Maples v. United Sav. and Loan Ass'n.*, *supra*, at 527–28 (emphasis added). Based upon the above principles and believing them to be sound, this court finds that paragraph Second of Instruction No. 8 was not erroneous in the particulars claimed.

Judgment for defendant is affirmed.

FLANIGAN, C.J., and PARRISH, P.J., concur.