**Madolyn HAHN, Personal Representative of the Estate of Jerry L. Hahn, Deceased, Plaintiff–Appellant,**

v.

**Patricia TANKSLEY, and Rick Tanksley, and Mona Horrell and Randy Horrell, Defendants–Respondents.**

No. SD 29751.

Missouri Court of Appeals,
Southern District,
Division One.

May 27, 2010.

Motion for Rehearing or Transfer Denied
June 18, 2010.

Application for Transfer Denied
Aug. 31, 2010.

6. We thank both counsel for the State and the defense for the superior quality of their briefs and argument.

Tom K. O'Loughlin, II, Cape Girardeau, MO, for Appellant.

Albert M. Spradling, III, Cape Girardeau, MO, for Respondents.

JEFFREY W. BATES, Judge.

Jerry Hahn (Jerry) brought suit against his daughters, Patricia Tanksley (Pat) and Mona Horrell (Mona) (collectively, Daughters), and their husbands, Rick Tanksley and Randy Horrell.[1] Jerry sought to set aside a deed and recover proceeds from certain bank accounts that Daughters had allegedly converted. Shortly after the case was tried to the court, Jerry died. Madolyn Hahn (Hahn), who was Jerry's third wife, was appointed as the personal representative of his estate. Personal representative Hahn was substituted as the plaintiff in the underlying action. Thereafter, the trial court ruled against Hahn and in favor of Daughters. On appeal, Hahn contends the trial court erred by:

(1) refusing to set aside the deed because the only substantial and competent evidence in the case, as well as the weight of the evidence, supported Jerry's request for rescission of the deed; and (2) refusing to enter a money judgment for the proceeds of the bank accounts because the only substantial and competent evidence in the case showed Jerry did not intend to give the proceeds to Daughters. This Court affirms.

## I.  Factual and Procedural Background

Jerry was born in 1935. He died in November 2008 at the age of 73. Jerry was married three times and believed he had five children: one son born during his first marriage; the two Daughters born during his 48–year marriage to Glenda Hahn (Glenda); and two other children, a son and a daughter, born out of wedlock to Hahn while Jerry was married to Glenda. Jerry's belief that Hahn's children were his offspring was based upon the fact that he had an affair with Hahn while married to Glenda. No tests to determine the paternity of Hahn's children were ever done, and Hahn never asked Jerry for child support. Glenda died of cancer in October 2003. In February 2006, Jerry married Hahn.

Jerry attended school through the eighth grade. At age 13, Jerry began working for his aunt and uncle, Daisy and Herman Birkman, on their farm (hereinafter, the farm). The farm, which was bisected by Gizzard Creek, was located in Bollinger County just across the Cape Girardeau County line. The property consisted of 105 acres of flat, irrigated land used to grow row crops. It was worth from $300,000 to $350,000. The Birkmans also

---

1. Because several persons mentioned in this opinion share the same surname, we refer to each such person by his or her first name for purposes of clarity.

owned a house in Chaffee (hereinafter, the Birkman house). Herman died first, and then Daisy died in 1988. While married to Glenda, Jerry inherited the farm, the Birkman house and $14,000 in cash. After inheriting the farm, Jerry rented it to others. At the time of trial, the farm was rented to Terry Givens for $9,400 a year. Daughters never worked on the farm. Jerry and Glenda later decided to trade the Birkman house for a different residence in Chaffee (hereinafter, the Chaffee house). During the marriage, Glenda did not inherit any property. Other than the Birkman inheritance, the couple's assets were acquired as a result of their employment while they were married.

Beginning at age 10, Jerry had been employed as a school "janitor" making $10.00 a month. Thereafter, he worked at a shoe factory for 11 years. He was a Teamster for 28 years, hauling heavy construction equipment to job sites all over the country. Jerry began smoking two or three packs of cigarettes a day at age 16 or 17 and continued to smoke heavily throughout his working years. After angioplasty in 1990 at age 55, Jerry was disabled and never worked again. Following his disability, Jerry said "he couldn't do too much." About eight years prior to the trial, Jerry began breathing with the aid of an oxygen canister he carried with him. His heart and lungs were in failing condition. During the couple's marriage, Glenda worked at a shoe factory, kept family records, paid bills and made bank deposits. Jerry said he "never had any use for checks" and never wrote a check. He signed checks completed for him by others, including Glenda, Mona, Pat or the payee. He turned his earnings over to Glenda. While she handled the checking

and savings accounts, Jerry did know how to review those account statements and did so after he became disabled.

Beginning in 1979, Glenda, Pat and Mona had opened a joint savings account (Account 1). Jerry's name was not on Account 1 at the time the account was created, but he was added to the account in July 1984. Jerry and Glenda also had another joint savings account (Account 2). Both accounts were at a bank in Chaffee. Daughters also were named on the checking account of Jerry and Glenda, which was used solely for the couple's expenses.

In the fall of 2003, Glenda was diagnosed as having cancer. In early October 2003, Jerry asked Pat to go to the bank. Jerry told bank employee Denise Haislip (Haislip) that he wanted to deposit $8,200 into Account 1 and have his name taken off of Account 1 and Account 2. Haislip testified that an account holder cannot just remove his or her name from an account. Instead, the account must be closed, and a new account must be opened. Jerry instructed Haislip to do so, which resulted in two new joint accounts being set up in only Daughters' names. Documentary evidence from the bank confirmed that this procedure was followed. Jerry signed withdrawal slips from Account 1 and Account 2 and then deposited the same amounts into new accounts in Daughters' names only. A deposit was put into the first new savings account for Daughters (Account 3) in the amount of $31,985.56, which consisted of the money from Account 1 plus the $8,200 deposit. Another deposit was put into the second new savings account for Daughters (Account 4) in the amount of $17,206.27.[2]

**2.** Documentary evidence consisting of the savings withdrawal slips with Jerry's signature and the new deposit slips showing these

transactions were admitted in evidence by stipulation as Defendants' Exhibits E and F.

Later in October 2003, Jerry went to see Jim Green (Green) while Glenda was in the hospital. Green was a Sikeston lawyer who had done Jerry's legal work for 20 years. Jerry had never used any other lawyers. As a result of the meeting, Green prepared two beneficiary deeds: one for the farm; and another for the Chaffee house. The deed beneficiaries were Daughters. Jerry and Pat returned to Green's office to sign the two beneficiary deeds. Because Glenda was in the hospital, she did not go and was unable to sign the deeds. According to Pat, Green advised her to sign her mother's name on both deeds, although the attestation clauses both said Glenda "personally appeared."[3] Pat was aware of these deeds and knew generally the legal effect was to make them the owners of the Chaffee house and the farm at the death of the surviving parent. The Daughters also understood that, prior to that event, they could be eliminated as beneficiaries. Jerry described the deeds as "putting somebody else's name on with yours." He understood that, because of these two beneficiary deeds, the farm and the Chaffee house would be owned by Daughters when he and Glenda were both deceased. The notarized deeds bore the date October 1, 2003 and were recorded on October 6, 2003. Green also prepared a durable power of attorney for Jerry, appointing Pat and Mona as his attorneys-in-fact to make decisions on Jerry's behalf in the event he was unable to do so. The durable power of attorney, however, was not executed at that time.

Following Glenda's death in late October 2003, Daughters (primarily Mona) handled Jerry's checking account for him and paid his bills. Jerry kept currency in his home safe, and Pat knew the combination. Daughters' assistance continued from Glenda's death in October of 2003 until mid–2005. During that time, Daughters would stop to see their father before work and would sometimes stop at noon. Jerry would come to their houses to eat from time to time. They would visit with Jerry before he went to bed. They often took him to the store or picked up items that he needed. In January or February of 2004, Jerry also started seeing Hahn again.

In February 2005, Jerry drove himself to Green's office to discuss estate planning issues. Jerry asked Pat to meet him there. Jerry wanted to put the farm and the Chaffee house in Daughters' names "with him having a lifetime estate." Jerry also wanted to continue receiving the rent from the farm. Jerry asked Green to prepare deeds to accomplish that end. Green said he would prepare the warranty deeds soon and call Jerry to come sign them when they were ready.

Thereafter, Green prepared the deeds as promised. He left a message on Jerry's answering machine that the deeds were ready, but Jerry never went back to Green's office to sign the deeds because he got sick.[4] On February 18, 2005, Jerry was admitted to Southeast Missouri Hospital in Cape Girardeau (the hospital). Initially, he was admitted for exacerbation of chronic obstructive pulmonary disease, urinary incontinence and hypertension. Jerry's medical records note breathing problems "off and on for a few weeks" and that Jerry was seen in the emergency room twice before admission.[5] Jerry's breathing

3. The 2003 beneficiary deeds were admitted in evidence by stipulation as Plaintiff's Exhibits 1 and 2.

4. The 2005 unsigned warranty deeds prepared by Green were admitted in evidence by stipulation as Defendants' Exhibits A and B.

5. Jerry's medical records were admitted in evidence by stipulation as Plaintiff's Exhibit

problems worsened despite breathing treatments. Among other ailments, Jerry had congestive heart failure. He had to be intubated and remained on a ventilator many days. He required tube feeding. He was "very confused" upon being extubated. He was given Seroquel, an antipsychotic drug, because he became "quite confused" and "agitated." Jerry was taking 11 medications in addition to Seroquel.

On March 12, 2005, Dr. Spitler, a cardiologist treating Jerry, noted that he was confused, but "is oriented." Dr. Brent Voszler (Dr. Voszler), Jerry's expert, acknowledged that Dr. Spitler underlined the word "is" before oriented and that, medically speaking, oriented means that person has an orientation to person, place and time. Although Dr. Voszler did not remember Jerry in 2005, Dr. Voszler had examined Jerry while he was at the hospital. Dr. Voszler's notes did not indicate Jerry was exhibiting any confusion.

On March 14, 2005 Jerry's physician, Dr. David Catron, noted that Jerry wanted to go to the Chaffee Nursing Center (the nursing home) for physical therapy to improve his strength. According to Dr. Catron's notes, Jerry's "mentation had been improving significantly." Dr. Catron discharged Jerry from the hospital that day, and he was transported to the nursing home. Jerry spoke to Daughters on the 14th and told them "to get down to Jim Green's office immediately and get those deeds and get them recorded because there's going to be a hell of a lawsuit." According to Pat, Jerry was scared of Hahn and had heard that she might be planning a lawsuit against him. Jerry wanted to "transfer the farm into [Daughters' names] and he wanted to transfer the home into [Daughters' names], giving him

a lifetime estate." Daughters went to Green's office and picked up the two warranty deeds, along with a transmittal letter from Green to Jerry. Thereafter, Daughters took the deeds to the Scott County Recorder, Tom Dirnberger, to inquire about the best way to get the deeds completed and accomplish what Jerry wanted. Dirnberger advised Daughters to have the deeds reviewed by another lawyer, Scott Horman (Horman).[6]

On March 15, 2005, the day after Jerry was transferred to the nursing home, the social services progress note from Carolyn Price, SSW (Price) indicated Jerry was "alert and oriented X3. Score of 2 on SPMSQ indicates intact intellectual functioning." That same day, Jerry executed the durable power of attorney that Green prepared in 2003, which appointed Daughters as Jerry's attorneys-in-fact. Price witnessed his signature. That same day, Daughters contacted Horman and explained that Jerry wanted to transfer to Daughters ownership of the farm and the Chaffee house, with a life estate for Jerry, as soon as possible. Horman understood Jerry wanted a life estate reserved in the warranty deed for the Chaffee house only. He told Pat that, if there is no home on a farm, a life estate is not usually reserved. Because the farm warranty deed that Green prepared reserved a life estate for Jerry, Horman explained he would prepare that deed differently to provide for an outright conveyance without a reserved life estate. Horman also explained that he would meet with Jerry personally to ensure that this was, in fact, what he wanted.

On March 16, 2005, Horman met with Jerry in the physical therapy room of the nursing home. Jerry said he wanted the Chaffee house and the farm deeded to

22.

Daughters. Jerry and Horman discussed the deeds that he had prepared, and Jerry said he wanted to sign the deeds. Prior to Jerry executing the deeds, Horman asked Jerry a series of questions to see if he was competent to proceed and understand what was transpiring. Horman asked Jerry about his marital status, the date, day of the week, his address, etc. Horman prepared a memorandum concerning his meeting with Jerry and the questions he was asked to answer.[7] After Jerry answered a series of questions correctly, Horman formed an opinion that Jerry was competent to sign the deeds. Horman based his belief on Jerry's demeanor, the fact he knew Horman, and the fact that Jerry was oriented to person, place and time. In addition, Horman served as a Guardian Ad Litem (GAL) around 150 times. In Horman's capacity as a GAL, he would question a proposed ward to determine whether the person understood the nature and extent of his or her property. Horman posed similar questions to Jerry. The deeds that Horman prepared were identical to the deeds Green prepared, except that the Horman deeds eliminated the reserved life estate on the farm. Horman discussed this difference with Jerry before he signed the deeds. According to Horman, Jerry knew that he was not going to have a life estate interest in the farm. Jerry signed the warranty deeds in the nursing home, and they were notarized by a nursing home employee. While the notary was present, Jerry exhibited no reservations about executing the two deeds.

Other witnesses also testified Jerry was competent to sign the deeds that Horman prepared. A summary of their testimony follows.

Sherry Kinder (Kinder), a friend of Jerry and Glenda, saw Jerry a couple times each week while he was in the hospital. Kinder had conversations with Jerry. According to her, Jerry appeared to act just like he always did and seemed to know what he was doing. Kinder also visited Jerry in the nursing home on one occasion. Once again, he did not appear confused and continued to act like the same old Jerry.

Danny Bollinger (Bollinger) had been Jerry's friend off and on for 40 years. Bollinger saw Jerry while he was in the hospital at least once or twice a day. In Bollinger's opinion, Jerry knew what he was doing and did not appear confused while he was in the hospital. Bollinger also visited Jerry in the nursing home once or twice a day. Once again, Bollinger opined that Jerry did not appear confused. Bollinger witnessed Jerry's signature on a power of attorney that Jerry signed on March 15, 2005.[8] According to Bollinger, Jerry did not appear confused or unaware of what he was doing. While Jerry was in the nursing home, Bollinger did not see anything that caused him to believe Jerry was confused or was acting funny or strange. Except for when Jerry was on a ventilator in the hospital, Bollinger never believed that Jerry was unable to understand what was happening, either in the hospital or in the nursing home.

Pat testified that she and Mona were with Jerry at the hospital "24/7." Pat observed Jerry while he was in the hospital and in the nursing home. Pat opined that Jerry knew what he was doing, particularly with respect to the deeds. Ac-

---

7. This memorandum was admitted in evidence by stipulation as Plaintiff's Exhibit 5. The deeds prepared by Horman were admitted in evidence by stipulation as Plaintiff's Exhibits 6 and 7.

8. Although Jerry executed this durable power of attorney in March 2005, it was never utilized by Pat or Mona for any purpose.

cording to Pat, Jerry expressed no reservations about the transfer of ownership. After Jerry returned home, he resumed driving his car and was able to get around. Jerry also bought and was able to ride a 4–wheeler. He resumed riding his horse. Jerry was capable of cooking, cleaning the house and performing his own personal hygiene tasks. The only physical task Jerry could not do was mowing the yard. In 2005 and 2006, Jerry's mother was in a nursing home in Chaffee. Jerry took care of his mother's affairs, which included selling her house and making any health care decisions that needed to be made before she died. At no time up to this point did Jerry question his transfer of ownership of the farm, the Chaffee house or the savings accounts.

In October 2005, Daughters voluntarily deeded the Chaffee house back to Jerry at his request. At the same time, Jerry executed another beneficiary deed conveying the house back to Daughters upon his death.[9] Daughters also voluntarily agreed to pay Jerry all of the rent derived from the farm as long as he lived. Thereafter, Jerry received the farm rent pursuant to that agreement.[10] Jerry and Hahn got married in February 2006. Jerry's relationship with Hahn caused considerable family discord.[11]

In December 2006, Daughters first learned Jerry was demanding that they return the real property Jerry had deeded to them and the proceeds from Accounts 1 and 2. In January 2007, Jerry filed a petition to set aside the deed to the farm and to recover the proceeds from Accounts 1 and 2 based on the alleged conversion of those accounts by Daughters. Jerry's petition alleged that the deed he signed, conveying the farm to Daughters, was void because it was procured by undue influence and fraud at a time when he was incompetent. The petition further alleged that Daughters breached a confidential and fiduciary relationship with Jerry.[12] Daughters' position was that Jerry knew what he was doing when he conveyed the farm to Daughters and gave the proceeds of Accounts 1 and 2 as gifts to them. Daughters claimed that Hahn was the cause of the dispute between Jerry and Daughters.

Trial of this case ended in October 2008. Jerry testified that he did not know what he was doing while he was in the hospital and in the nursing home in 2005. Jerry's expert, Dr. Voszler, reviewed Jerry's medical records and opined that Jerry must have been incompetent at that time. An independent neuropsychological evaluation of Jerry by a professional psychologist was ordered by the court. As of the time of trial, no definitive diagnosis of incompetency was made. With respect to the savings accounts, Jerry testified that he only want-

9. Jerry later revoked that deed and added Hahn's name onto the title to the home.

10. The record shows that some of the rent was later paid into the registry of the court and released to Jerry by agreement of all parties.

11. For example, Jerry's name was omitted as a grandparent of Pat's son in a newspaper notice she submitted relating to her son's graduation. Pat did this because she was upset when her mother, Glenda, was omitted from the obituary of Jerry's mother, who had died in June 2006. According to Pat, Jerry's mother had written her own obituary before her death and included Glenda as preceding her in death. When the obituary was published in the paper, Glenda was omitted. In addition, on the way to depositions in this case, Jerry and Hahn had a car wreck, and Jerry claimed that Daughters "drove by [him] like a skunk laying in the road."

12. Jerry also sought a declaratory judgment for recovery of additional rent, which is not at issue in this appeal.

ed Glenda's name removed from the accounts and that he did not intend to give Daughters the proceeds of these accounts.

Jerry died in November 2008 before the court rendered any decision in the lawsuit. Personal representative Hahn was substituted as plaintiff. In April 2009, the trial court found in favor of Daughters and against personal representative Hahn. After hearing all of the evidence, the court made a specific finding that "Jerry Hahn was capable of determining his property and to whom he wished to give it." The court also found that Jerry "just seemed to change his mind from time to time but the greater weight of the evidence is that he wished to give his property to his daughters Patricia and Mona." The court also specifically found that, at the time of the deeds' execution in 2005, Jerry was competent to transfer the farm to Daughters, and that the facts did not support a finding of fraud or undue influence. The court further found that Jerry voluntarily and intentionally transferred the savings accounts to Mona and Pat in 2003, so no conversion took place. This appeal followed.

## II. Standard of Review

In this court-tried case, the judgment must be affirmed unless it is not supported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law. *Ewanchuk v. Mitchell*, 154 S.W.3d 476, 478 (Mo.App. 2005); Rule 84.13(d).[13] The trial court's judgment is presumed correct, and Hahn bears the burden of proving it erroneous. *Surrey Condominium Ass'n, Inc. v. Webb*, 163 S.W.3d 531, 535 (Mo.App.2005).

On appeal, this Court views the evidence and all reasonable inferences in the light most favorable to the judgment and disre-gards all contrary evidence and inferences. *Strobl v. Lane*, 250 S.W.3d 843, 844 (Mo. App.2008). The credibility of the witnesses and the weight to be given to their testimony is for the trial court, which is free to believe none, part or all of the testimony of any witness. *Christian Health Care of Springfield West Park, Inc. v. Little*, 145 S.W.3d 44, 48 (Mo.App.2004). This Court defers to the credibility determinations of the trial court "because it is in a better position to not only judge the credibility of witnesses directly, but also their sincerity and character as well as other trial intangibles which may not be completely revealed by the record." *Tichenor v. Vore*, 953 S.W.2d 171, 174 (Mo. App.1997); *Brown v. Brown*, 152 S.W.3d 911, 913–14 (Mo.App.2005); Rule 84.13(d)(2). "An appellate court exercises extreme caution in considering whether a judgment should be set aside on the ground that it is against the weight of the evidence and will do so only upon a firm belief that the judgment was wrong." *Simpson v. Strong*, 234 S.W.3d 567, 578 (Mo.App.2007). The phrase "weight of the evidence" means its weight in probative value, rather than the quantity of evidence. *Nix v. Nix*, 862 S.W.2d 948, 951 (Mo.App. 1993). The weight of the evidence is not determined by mathematics, but depends on its effect in inducing belief. *Id.*

## III. Discussion and Decision

### Point I

■■■■ In Hahn's first point, she contends the trial court erred in refusing to set aside the March 2005 warranty deed to the farm. "A suit to have a deed declared void invokes the most extraordinary power of equity." *Lee v. Hiler*, 141 S.W.3d 517, 523 (Mo.App.2004). "Consequently, a party seeking cancellation of a deed bears the

---

**13.** All references to rules are to Missouri Court Rules (2010).

burden of establishing by clear, cogent, and convincing evidence the basis for exercising such power." *Id.*; *Blackburn v. Spence,* 384 S.W.2d 535, 539 (Mo.1964). The evidentiary burden imposed by the clear, cogent and convincing standard of proof requires "the trial court be clearly convinced of the proposition to be proved." *Celtic Corp. v. Tinnea,* 254 S.W.3d 137, 141 (Mo.App.2008); *see Grissum v. Reesman,* 505 S.W.2d 81, 85–86 (Mo.1974).

■■■ Where, as here, the basis for setting aside a deed is the grantor's alleged lack of mental capacity, "[t]he burden is upon those who seek to have the deed set aside to establish that, at the time of its execution, the grantor lacked sufficient mental capacity." *Estate of Helmich v. O'Toole,* 731 S.W.2d 474, 478 (Mo.App. 1987). The grantor's mental capacity on the date of execution may be demonstrated with evidence of the grantor's condition before and after the execution. *Id.* The issue to be determined is whether the grantor "had the mental capacity at the time of execution of the deeds sufficient to understand the nature of the transaction, the extent of his property and the ability to recognize the objects of his bounty." *Gifford v. Geosling,* 951 S.W.2d 641, 644 (Mo.App.1997). Where the grantor's conveyance is to a blood relative, courts are more reluctant to declare such a conveyance as an unnatural disposition of the grantor's property. *Wingate v. Griffin,* 610 S.W.2d 417, 420 (Mo.App.1980). "Instances of illness, imperfect memory, forgetfulness, physical and intellectual weaknesses associated with old age, and mental confusion are generally not sufficient evidence to invalidate a deed." *Thurmon v. Ludy,* 914 S.W.2d 32, 34 (Mo.App.1995); *Gifford,* 951 S.W.2d at 644.

■■■ Here, the trial court determined that Jerry was competent to execute the warranty deeds in question, specifically finding that Jerry "was capable of determining his property and to whom he wished to give it." Hahn essentially argues that the court's determination of competency is based on insufficient evidence and is against the weight of the evidence. This Court is not persuaded by either argument.

Ample evidence supports the court's determination that Jerry was competent at the time he executed the deeds on March 16, 2005. When Jerry arrived at the nursing home on March 15th, Price's social services progress note stated that Jerry was alert and orientated with intact intellectual functioning. Before the deeds were signed the next day, Horman questioned Jerry at length. Horman similarly determined Jerry was oriented to person, place and time, and understood what was taking place. Horman had extensive experience as a GAL and, based on that experience, determined Jerry was competent to proceed. Horman testified that, before Jerry signed the warranty deeds, he knew: (1) the deed to the farm was different than that prepared by Green; and (2) Jerry no longer had a life estate reserved on the farm. In addition, Jerry's long-time friends Kinder and Bollinger both testified that when they saw Jerry in the nursing home, Jerry did not appear to be confused to them and that he was the same old Jerry. Moreover, Jerry's actions before and after he executed the deeds demonstrated his intention that Daughters ultimately own both the farm and the Chaffee house. Not only did he make his intention clear in the 2003 beneficiary deeds and the 2005 unsigned deeds prepared by Green before March 2005, but also afterwards in October 2005 when Jerry once again executed another beneficiary deed conveying the Chaffee house to Daughters after they had voluntarily deeded it back to him. In addition, Jerry took care of his mother's

affairs in 2005 and 2006 until her death. All this evidence is more than sufficient to support the trial court's finding that Jerry was competent to execute the March 2005 deed to the farm.

■ Hahn's argument that the trial court's findings are against the weight of the evidence fares no better. Hahn argues that the "overwhelming weight of the un-refuted medical records, medical opinion and Jerry's testimony" show that Jerry did not understand the nature and effect of the deeds.[14] Hahn's argument essentially asks this Court to attribute greater weight to the above-described evidence and find it more credible than that of Daughters. This we cannot do. The credibility of the witnesses and the weight to be given to their testimony is for the trial court, which is free to believe none, part or all of the testimony of any witness. *Christian Health Care of Springfield West Park, Inc. v. Little*, 145 S.W.3d 44, 48 (Mo.App.2004). The trial court was not required to believe Dr. Voszler's testimony, the portions of the medical records upon which Hahn relies, or Jerry's subjective testimony that he was incompetent when he executed the deeds. *In re Gene Wild Revocable Trust*, 299 S.W.3d 767, 781 (Mo.App.2009). As is evident from the trial court's findings, the court did not believe that evidence was credible. This Court defers to the trial court's credibility determinations. *See id.*; Rule 84.13(d)(2).[15] This Court's independent review of the record has not left us with a firm belief that the judgment was wrong. Consequently, the trial court's finding of competency is not against the weight of the evidence. *See Simpson v. Strong*, 234 S.W.3d 567, 578 (Mo.App. 2007).

In short, the trial court found that Hahn failed to satisfy her burden of showing by clear, cogent and convincing evidence that Jerry lacked the mental capacity to execute the March 2005 warranty deeds. The trial court's finding is supported by the evidence and is not against the weight of the evidence. Point I is denied.

### Point II

In Hahn's second point, she contends the trial court erred in refusing to find that Daughters converted the proceeds from Account I and Account 2. Hahn argues that the trial court's finding that Jerry made a gift of the savings accounts to Daughters is not supported by sufficient evidence. Hahn relies upon Jerry's trial testimony that he only wanted Glenda's name removed from the accounts and that

14. This Court's review of the record reveals that the medical records and medical testimony were not as one-sided as Hahn's argument suggests. Daughters presented medical opinion testimony and portions of the medical records, as well as lay testimony, which tended to support the trial court's findings.

15. Hahn asserts similar arguments with respect to alleged trial court error in its findings on the issues of fraud and undue influence. Because the court's findings on these issues similarly turn on its assessment of credibility, we likewise defer to these credibility determinations and do not separately address these arguments. Lastly, Hahn asserts in her point that the farm deed should have been rescinded because Daughters "were in a fiduciary and confidential relationship with Jerry as holders of a durable power of attorney" at the time of the deed's execution. Before any presumption of undue influence could arise based upon the execution of the durable power of attorney, Hahn had to prove that Daughters received a pecuniary benefit from the execution of the instrument. *Puzzanchera v. Loetel*, 293 S.W.3d 51, 60–61 (Mo.App.2009). The record contains no such evidence. Jerry had only executed the durable power of attorney the preceding day, and there is absolutely no evidence that Daughters received any pecuniary benefit whatsoever from that document's execution. Indeed, the record reveals that Daughters never used Jerry's durable power of attorney for any purpose.

he did not intend to give Daughters the proceeds of these accounts. We find Hahn's argument unpersuasive.

■ Conversion is the unauthorized assumption of the right of ownership over personal property of another to the exclusion of the owner's rights. *Reynolds County Memorial Hosp. v. Sun Bank of America*, 974 S.W.2d 663, 666 (Mo.App. 1998). "Obviously, if the owner consents, there is no unauthorized taking." *Maples v. United Sav. and Loan Ass'n*, 686 S.W.2d 525, 527 (Mo.App.1985); *see DeMean v. Ledl*, 796 S.W.2d 415, 422 (Mo. App.1990) (no unauthorized taking, hence no conversion).

■ With respect to Account 1, Daughters were already joint owners of that account prior to October 2003. "A joint account is the property of those persons so named as joint tenants and may be paid to any one of such persons during his lifetime or to any of the survivors of them after the death of any one or more of them." *Estate of Rogers v. Battista*, 125 S.W.3d 334, 343 (Mo.App.2004); §§ 362.470, 369.174 RSMo (2000). After Account 1 was closed at Jerry's behest and Account 3 was opened in Daughters' names alone, they continued to be joint owners of the money deposited into that new account. Daughters could not convert their own property. Therefore, the trial court correctly determined that Daughters did not convert the proceeds of Account 1.

■ With respect to Account 2, the trial court found that Jerry personally authorized the closing of that account and the transfer of the proceeds into Account 4 as a gift to Daughters. Giving the trial court's factual findings the deference they are due on appeal, that determination was

correct. "The requirements for completion of an *inter vivos* gift transfer are: (1) the donor's present intention to make a gift to the donee; and (2) acceptance of the gift by the donee, whose ownership takes effect immediately and absolutely." *Estate of Thompson v. Hicks*, 148 S.W.3d 32, 35 (Mo.App.2004); *Kennedy v. Milligan*, 915 S.W.2d 784, 789 (Mo.App.1996). Generally, a gift must be proven by clear and convincing evidence. *Kennedy*, 915 S.W.2d at 789. Here, the court's finding that Jerry made a gift of the proceeds of Account 2 to Daughters was supported by Haislip's testimony and the documentary evidence relating to the closing of Account 2 and the opening of Account 4. The trial court could, and did, disbelieve Jerry's contrary testimony. *See Christian Health Care of Springfield West Park, Inc. v. Little*, 145 S.W.3d 44, 48 (Mo.App.2004).[16] Thus, Daughters presented clear and convincing evidence that Jerry intended to make a gift of the proceeds of Account 2 to them. Because Jerry authorized and, therefore, consented to this change in the ownership of Account 2, the trial court correctly determined that Daughters did not convert the proceeds of that account. Point II is denied.

The judgment of the trial court is affirmed.

BARNEY and BURRELL, JJ., Concur.

---

16. As the trial court correctly noted, when Jerry closed Accounts 1 and 2 and opened Accounts 3 and 4 in October 2003, there were no allegations or evidence that he did so due to incapacity, fraud or undue influence.